# EXHIBIT

# P

# PEPPERDINE LAW REVIEW OF NEGOTIABILITY

**Pepperdine Law Review**

Volume 37

Issue 2 *Symposium: Bringing Down the Curtain on the Current Mortgage Crisis and Preventing a Return Engagement*

Article 7

2-15-2010

# How Negotiability Has Fouled Up the Secondary Mortgage Market, and What to Do About It

Dale A. Whitman

Follow this and additional works at: http://digitalcommons.pepperdine.edu/plr

Part of the Commercial Law Commons, and the Housing Law Commons

Recommended Citation

Dale A. Whitman *How Negotiability Has Fouled Up the Secondary Mortgage Market, and What to Do About It*, 37 Pepp. L. Rev. 2 (2010)
Available at: http://digitalcommons.pepperdine.edu/plr/vol37/iss2/7

This Symposium is brought to you for free and open access by the School of Law at Pepperdine Digital Commons. It has been accepted for inclusion in Pepperdine Law Review by an authorized administrator of Pepperdine Digital Commons. For more information, please contact Kevin.Miller3@pepperdine.edu.

# How Negotiability Has Fouled Up the Secondary Mortgage Market, and What to Do About It

Dale A. Whitman[*]

I. THE SECONDARY MORTGAGE MARKET
II. THE RELEVANCE OF NEGOTIABILITY TO THE SECONDARY MORTGAGE MARKET
III. DETERMINING NEGOTIABILITY: A SURVEY
IV. THE PROBLEM OF DELIVERY OF NEGOTIABLE NOTES
V. THE SOLUTION: ELIMINATING NEGOTIABILITY OF MORTGAGE NOTES
VI. CONCLUSION

The premise of this paper is that the concept of negotiability of promissory notes, which derives in modern law from Article 3 of the Uniform Commercial Code, is not only useless but positively detrimental to the operation of the modern secondary mortgage market. Therefore, the concept ought to be eliminated from the law of mortgage notes.

This is not a new idea. More than a decade ago, Professor Ronald Mann made the point that negotiability is largely irrelevant in every field of consumer and commercial payment systems, including mortgages.[1] But Mann's article made no specific recommendations for change, and no change has occurred.

I propose here to examine the ways in which negotiability and the holder in due course doctrine of Article 3 actually impair the trading of mortgages. Doing so, I conclude that these legal principles have no practical value to the parties in the mortgage system, but that they impose significant

---

[*] D & L Straus Visitor, Pepperdine University School of Law; Professor of Law Emeritus, University of Missouri-Columbia School of Law

1. Ronald J. Mann, *Searching for Negotiability in Payment and Credit Systems*, 44 UCLA L. REV. 951, 969–73 (1997).

and unnecessary costs on those parties. I conclude with a recommendation for a simple change in Article 3 that would do away with the negotiability of mortgage notes.

## I. THE SECONDARY MORTGAGE MARKET

In this era, it is a relatively rare mortgage that is held in portfolio for its full term by the originating lender. Instead, the vast majority of mortgages are either traded on the secondary market to an investor who will hold them,[2] or to an issuer (commonly an investment banker) who will securitize them. Securitization refers to the practice of issuing securities based on pools of underlying mortgages.[3] The securities may be "participation certificates," each of which represents a small fractional share of ownership in the underlying mortgage pool.[4] More commonly, however, the securities are, in effect, bonds that are collateralized by the pool of mortgages.[5] The advantage of the latter approach is that there may be many classes of bonds carrying different payment schemes and different priorities, collateralized by a single pool of mortgages.[6]

Recent events have demonstrated that this system has many defects. During the period from 2001 through 2006, many very bad mortgage loans were made.[7] By "bad," I mean that they were originated either extremely carelessly or by means of outright fraud on the part of the borrower, often with the connivance of a mortgage broker or a loan officer for the originating lender, and sometimes with the lender's full knowledge and encouragement.[8] Because these loans were so badly underwritten, they carried a high probability of default. The subsequent downturn in real estate

---

2. Fannie Mae and Freddie Mac, the two principal government-sponsored entities (GSE), were traditionally the largest secondary market investors in residential mortgages. *See* Thomas E. Plank, *Regulation and Reform of the Mortgage Market and the Nature of Mortgage Loans: Lessons from Fannie Mae and Freddie Mac*, 60 S.C. L. REV. 779, 796–804 (2009).

3. Ryan E. Scharar, Comment, *The Limits of Securitization: Why Bankruptcy Courts Should Substantively Consolidate Predatory Sub-Prime Mortgage Originators and Their Special Purpose Entities*, 2008 MICH. ST. L. REV. 913, 918–19 (2008).

4. *Id.*

5. *Id.*

6. Mortgage securitization and its variations are described in ADAM B. ASHCRAFT & TIL SCHUERMANN, FED. RESERVE BANK OF N.Y., UNDERSTANDING THE SECURITIZATION OF SUBPRIME MORTGAGE CREDIT, (2008), *available at* http://www.newyorkfed.org/research/staff_reports/sr318.pdf. *See also* Derrick M. Land, *Residential Mortgage Securitization and Consumer Welfare*, 61 CONSUMER FIN. L.Q. REP. 208, 209–10 (2007); Scharar, *supra* note 3, at 918–26.

7. *See* Ronald D. Utt, The Heritage Foundation, Subprime Mortgage Problems: A Quick Tour Through the Rubble (Apr. 3, 2008), http://www.heritage.org/Research/Economy/wm_1881.pdf.

8. *See, e.g.*, Bob Tedeschi, *Loan Fraud Seen on the Rise*, N.Y. TIMES, Jan. 18, 2009, at RE6, *available at* http://www.nytimes.com/2009/01/18/realestate/18mort.html; John Leland, *Officials Falling Behind on Mortgage Fraud Cases*, N.Y. TIMES, Dec. 25, 2007, http://www.nytimes.com/2007/12/25/us/25fraud.html.

738

prices throughout most of the nation between 2006 and 2008 virtually guaranteed that many residential mortgage loans would default.[9] Moreover, when these loans were securitized, the investors who purchased the securities were generally unaware or heedless of the poor quality of the underlying loans, and they were not sufficiently warned by the national rating agencies of the risks they were accepting.[10] Enormous losses to the investors ensued.[11]

When investors began to realize the full scope of these losses, the system of mortgage securitization ground to a halt.[12] Indeed, a number of reforms will need to be implemented before it makes sense to resurrect the system again. In all likelihood, mortgage securitization will once again become a source of mortgage capital. Though an interesting topic,[13] the nature of those reforms is not the focus of this paper. Meanwhile, the two major federally-sponsored secondary market agencies, Fannie Mae and Freddie Mac, continue to purchase residential mortgages in large quantities from originating lenders[14] despite the fact that they have been placed in federal conservatorship.[15]

---

9. *See* James Saft, *U.S. Housing Collapse May Portend Slow Economic Growth for Years*, N.Y. TIMES, Feb. 9, 2008, http://www.nytimes.com/2008/01/29/business/worldbusiness/29iht-inside30.1.9568999.html.

10. *See, e.g., Credit Rating Agencies and the Financial Crisis: Hearing Before the Comm. on Oversight and Gov't Reform*, 110th Cong. 1 (Oct. 22, 2008) (opening statement of Rep. Waxman, Chairman, House Comm. on Oversight and Gov't Reform), *available at* http://oversight.house.gov/documents/20081022102221.pdf (detailing the failures of the rating agencies). *See also* John Patrick Hunt, *One Cheer for Credit Rating Agencies: How the Mark-to-Market Accounting Debate Highlights the Case for Rating-Dependent Capital Regulation*, 60 S.C. L. REV. 749, 750–52 (2009). For evidence that securitization does indeed weaken the incentives of financial intermediaries to assess default risk carefully, see Benjamin J. Keys et al, *Securitization and Screening: Evidence from Subprime Mortgage Backed Securities*, 1 (2008), *available at* http://www2.law.columbia.edu/contracteconomics/conferences/laweconomicsS08/Vig%20paper.pdf.

11. Losses to major banks and investment banking houses through early 2008 are detailed in Mortgage-Backed Securities (MBS), Wikinvest.com, http://www.wikinvest.com/metric/Mortgage-Backed_Securities_(MBS) (last visited Nov. 3, 2009). *See also* Gretchen Morgenson, *Investors in Mortgage-Backed Securities Fail to React to Market Plunge*, N.Y. TIMES, Feb. 18, 2007, http://www.nytimes.com/2007/02/18/business/worldbusiness/18iht-morgenson.4633573.html; Christian Baumgaertel & Christine Harper, *UBS Has Loss, to Cut Jobs. After Subprime Writedowns*, Oct. 1, 2007, http://www.bloomberg.com/apps/news?pid=20601087&sid=amzHxK6x1zNU&refer=home.

12. *See* Standard & Poor's, *RMBS Trends: U.S. RMBS Subprime Securitization Volume Declines Amid More-Stringent Guidelines*, Aug. 31, 2007, http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/3,1,1,0,1148447105682.html.

13. *See, e.g.*, Mortgage Reform and Anti-Predatory Lending Act, H.R. 1728, 111th Cong. (2009); Plank, *supra* note 2 (discussing mortgage loans and different reforms of the mortgage market).

14. Alan Zibel, *Fannie Mae, Freddie Mac Struggle a Year After Takeover*, HUFFINGTON POST,

While the secondary mortgage market has experienced a major hiccup, it is not dead and will not die. We are unlikely to return to a system in which most mortgages are held in portfolio by their originators. Despite the current pause in securitization activity, it makes sense to cure its defects, including those arising from the negotiability doctrines addressed here, so that securitization will operate more effectively when the market returns.

I propose to show that negotiability introduces three major defects into the mortgage market. First, it is difficult, and sometimes well-nigh impossible, to determine whether a note is negotiable. This fact engenders either unnecessary litigation or a willingness on the part of litigants and courts to sidestep the issue, thus eliminating the transparency with which legal rules should be applied. Second, the maker of a negotiable note is often unable to raise as a defense the fraud or other misconduct of the originating lender. This tends to encourage misconduct, to reduce the incentive of secondary market purchasers to screen their loan sellers for bad behavior, and to produce a result that is unfair to the borrower. Third, negotiability requires that, for every loan sold on the secondary market, the original promissory note must be delivered to the purchaser. In a national or global market, this requirement is extremely inefficient and inconvenient, and in recent years, has been widely ignored, much to the detriment of mortgage purchasers.

Because negotiability is, for different reasons, undesirable from the viewpoint of both borrowers and secondary market investors, it is possible that consensus could be developed to eliminate it with respect to mortgage notes. I conclude by advocating this change.

This Article will proceed accordingly: Section II, which immediately follows, will explain why negotiability is an issue and show why it makes little sense in the modern secondary mortgage market.[16] Section III will discuss the difficulties that courts have encountered in determining whether or not negotiability is present, and will consider how the holder in due course doctrine, which arises out of negotiability, is currently being used in mortgage cases and whether it serves a useful function.[17] Section IV will explain how negotiability requires the delivery of the original promissory note when a loan is sold on the secondary market, and why that requirement is costly and undesirable to secondary market participants.[18] Finally, Section

---

Sept. 4, 2009, http://huffingtonpost.com/2009/09/08/fannie-mae-freddie-mac-st_0_n_279112.html.

15. The two government-sponsored entities (GSEs) were placed in conservatorship on September 7, 2008. MARK JICKLING, CONG. RES. SERV., FANNIE MAE AND FREDDIE MAC IN CONSERVATORSHIP 1 (2008), http://assets.opencrs.com/rpts/RS22950_20080915.pdf.

16. See infra notes 20–96 and accompanying text.
17. See infra notes 97–109 and accompanying text.
18. See infra notes 110–61 and accompanying text.

V will discuss how the problems associated with negotiability can be eliminated from the law of mortgage transfers.[19]

## II. THE RELEVANCE OF NEGOTIABILITY TO THE SECONDARY MORTGAGE MARKET

The early history of the concept of negotiability has been thoroughly and admirably recounted elsewhere,[20] and will be described only briefly here. It was developed in England in the late seventeenth and eighteenth centuries as a tool for facilitating the passage of bills of exchange in commerce. In 1696 Justice Holt decided *Hussey v. Jacob*,[21] holding that a good faith transferee of a bill of exchange took the bill free of the defenses that the drawer might raise to it—thus stating the fundamental premise of negotiability. Four years later, Holt refused to extend this principle to promissory notes,[22] but Parliament immediately reversed his decision in the 1704 Promissory Notes Act.[23] Thus, the stage was set for Lord Mansfield who, following Holt as Chief Justice, crystallized and restated the law of negotiable instruments forcibly and plainly.[24] Mansfield employed a "special jury" of merchants to advise him in doing so,[25] and his objective was to provide a body of law that was both certain and consistent with the commercial expectations of his day. In this he was spectacularly successful.

Mansfield's concepts of negotiability were codified in England in 1882 in the Bills of Exchange Act,[26] and in America in the Negotiable Instruments Law, first adopted by Connecticut in 1897, and subsequently by all of the states. The Negotiable Instruments Law ("N.I.L.") was supplanted in 1954 by Article III of the Uniform Commercial Code ("U.C.C."). These codifications did not alter the fundamental concepts of negotiability laid

---

19. *See infra* notes 162–78 and accompanying text.
20. *See* Kurt Eggert, *Held up in Due Course: Codification and the Victory of Form over Intent in Negotiable Instrument Law*, 35 CREIGHTON L. REV. 363, 368–74 (2002); Edward L. Rubin, *Learning from Lord Mansfield: Toward a Transferability Law for Modern Commercial Practice*, 31 IDAHO L. REV. 775, 775–77 (1995); James Steven Rogers, *The Myth of Negotiability*, 31 B.C. L. REV. 265 (1990).
21. (1696) 87 Eng. Rep. 588 & 591 (K.B.).
22. Clerke v. Martin, (1702) 92 Eng. Rep. 6 (K.B.); Buller v. Crips, (1703) 87 Eng. Rep. 793 (K.B.).
23. Promissory Notes Act, 1704, 3 & 4 Ann., c. 9 (Eng.).
24. *See, e.g.*, Miller v. Race, (1758) 97 Eng. Rep. 398 (K.B.) (good faith purchaser of bank note acquired good title to note); Peacock v. Rhodes, (1781) 99 Eng. Rep. 402 (K.B.) (good faith purchaser acquired title to bill of exchange).
25. *See* Rubin, *supra* note 20, at 780 & nn.26–30.
26. Bills of Exchange Act, 1882, 45 & 46 Vict., c. 61 (Eng.).

down by Lord Mansfield, but they effectuated a significant shift from treating negotiability as a matter of intent to employing a "checklist" approach, under which an instrument was negotiable if it met certain precise objective standards, irrespective of subjective intent.[27] Professor Kurt Eggert notes that drafting processes for both the N.I.L. and Article III were characterized by certain features: they were driven by the perceived need to satisfy banks and other commercial lenders (without whose support it was thought that the uniform acts could not achieve enactment),[28] and they gradually broadened the concept of negotiability, permitting more and more clauses to be added to documents without impairing their negotiability.[29]

It is important to realize that the modern applications of negotiability are entirely different from the needs it gave rise to satisfy. The original negotiable instruments were bills of exchange, employed by merchants to settle accounts for merchandise bought and sold, particularly in international transactions. The concept of the bill of exchange has long been obsolete, and modern merchants settle trades by the use of checks or wire transfers drawn on banks. The idea that a bill of exchange should be collectible by a good faith purchaser without regard to the defenses its issuer might raise simply has no modern relevance.

As noted above, promissory notes were also treated as negotiable from the early eighteenth century. But the types of promissory notes in use when the negotiability doctrine arose were quite distinguishable from those in use today. Early notes were typically issued by banks (or by goldsmiths, the predecessors of banks). Indeed, in the United States, privately issued bank notes were the principal form of currency until 1862, when the federal government began printing currency.[30]

Today, Federal Reserve Notes are the only currency in use in the United States. Private promissory notes are, for the most part, issued not *by* banks, but *to* banks. Their makers are private businesses and, to a very large extent, consumers. Banks and other commercial lenders are thus the primary beneficiaries of the negotiability concept, as witnessed by their vigorous efforts to maintain and strengthen it during the drafting of the N.I.L. and U.C.C. mentioned above.[31]

---

27. *See* Eggert, *supra* note 20, at 408–24 for a detailed description of the drafting process of the codification of the Negotiable Instrument Laws and the Uniform Commercial Code.
28. *Id.* at 409 (N.I.L), 419 (U.C.C.).
29. *See infra* notes 49–58 and accompanying text.
30. *See* John J. Chung, *Money as Simulacrum: The Legal Nature and Reality of Money*, 5 HASTINGS BUS. L.J. 109, 128–30 (2009) (noting that the Bank of the United States and the Second Bank of the United States issued notes that were used as currency (along with private bank notes) from 1791 until 1837. The period from 1837 to 1862 was known as the "Free Banking" period, and the only available currency consisted of private bank notes.).
31. *See supra* notes 28–29 and accompanying text.

The concept of negotiability was and is still purportedly based on the notion that one accepting such an instrument need not be concerned about the defenses its issuer might raise, nor about any extrinsic facts except the economic solvency of the issuer and any endorsers. It could, therefore, be accepted by anyone in the ordinary course of its transfer without any need for the person accepting it to inquire into the circumstances of its creation. Hence, the instrument could be treated like currency—the equivalent of cash.[32] As the Pennsylvania Supreme Court put it in 1846:

> [A] negotiable bill or note is a courier without luggage. It is a requisite that it be framed in the fewest possible words, and those importing the most certain and precise contract.... To be within the statute, it must be free from contingencies or conditions that would embarrass it in its course....[33]

Indeed, as Professor Eggert explains, early promissory notes issued by goldsmiths and banks were extremely simple, consisting merely of a promise to pay the principal sum, usually upon demand, and the signature of the maker.[34]

The typical promissory note used in a modern mortgage transaction is a far cry from this paradigm. The standard note form approved by Fannie Mae and Freddie Mac for use in one-to-four-family residential loans is 1,455 words in length in three pages without signatures,[35] and notes used in loans on commercial properties are commonly several times that size.[36]

More to the point, no intelligent investor in the modern secondary mortgage market would ever acquire a note without making extremely detailed inquiries about the circumstances of its creation. Doing so would be hardly less than financial suicide. To enumerate some of these concerns, the investor will need to know about—indeed will want assurances concerning—the real estate that secures the note, including: its value, the nature and condition of its improvements, its title, its zoning, and its

---

32. Thus Justice Mansfield held in *Miller v. Race*, (1758) 97 Eng. Rep. 398, 402 (K.B.), that "[a] bank-note is constantly and universally, both at home and abroad, treated as money, as cash; . . . and it is necessary, for the purposes of commerce, that their currency should be established and secured."
33. Overton v. Tyler, 3 Pa. 346, 347 (1846).
34. *See* Eggert, *supra* note 20, at 395–96, 401–02.
35. eFannniemae.com, Single Family, Legal Documents, MULTISTATE FIXED RATE NOTE, FORM 3200, *available at* https://www.efanniemae.com/sf/formsdocs/documents/notes/pdf/3200.pdf.
36. For example, a promissory note used in a commercial loan by the Bank of America, in which the author represented the borrower, had 6,130 words in nine pages. Bank of America Promissory Note (Dec. 1999) (on file with author).

occupancy. The investor will also wish to know a great deal of information about the borrower: income, employment, credit-worthiness and past payment history, assets, and the like. With loans on commercial properties, a variety of additional facts become significant to the purchaser of the loan, including the nature of the property's tenants and leases, the ability of the property's rental income to support its operating expenses and debt service, and the possible presence of hazardous waste.

While some investors in recent years have been sloppy and careless in their verification of these underlying facts, only a fool would doubt that they are highly relevant; any investor who disregards them does so at his peril. When a mortgage loan is sold on an individualized basis (as sometimes occurs with respect to large, multimillion dollar commercial loans), the secondary-market investor will ordinarily evaluate all of the facts mentioned above "by hand," reviewing the documentation as part of a "due diligence" effort. However, residential loans are often sold in large quantities, with dozens or even hundreds of loans in a single pool. In this setting, individualized due diligence is impractical. Hence, secondary-market investors employ other techniques: they establish published standards, which the loans they purchase must meet, and they require mortgage originators, who deliver loans to them, to represent and warrant that the loans being delivered meet those standards.

When Fannie Mae purchases a mortgage, for example, the mortgagee selling the loan is required to provide extensive warranties to Fannie Mae.[37] These warranties include statements that the mortgagee is authorized to do business in the jurisdiction where the property is located, that the loan conforms to all of Fannie Mae's requirements, that the mortgagee has the right to sell and assign the mortgage loan, that the mortgage is a valid lien on the property and is not subject to any prior liens (such as mechanics liens), that the documents are valid and enforceable and have not been modified or subordinated, that both title insurance and casualty insurance are in force, that the improvements on the property have not been damaged by a casualty and are located entirely within the property's boundaries, and that the property conforms to applicable zoning laws.[38]

The selling mortgagee must warrant that each loan was originated in conformity with Fannie Mae's very extensive requirements, including verification of the borrower's income, employment, credit history, assets and

---

37. For purposes of brevity, the illustrations in the text refer to Fannie Mae's procedures, but Freddie Mac's are similar. Both Fannie Mae and Freddie Mac guidelines, requirements, and contracts are available at www.allregs.com. *See Freddie Mac Single Family Seller/Servicer Guide,* http://www.allregs.com/tpl/Main.aspx (last visited Nov. 4, 2009).

38. FANNIE MAE, SINGLE FAMILY MORTGAGE SELLING AND SERVICING CONTRACT, SEC. IV.A (2005), *available at* http://efanniemae.com/sf/guides/ssg/#ssg (follow "Access the Selling and Servicing Guides via AllRegs" hyperlink).

funds on deposit, and previous mortgage payment history.[39] The mortgage itself must be warranted by the seller to meet Fannie Mae's guidelines with respect to the borrower's age and immigration status, the property's construction and occupancy, the type of mortgage transaction (with respect to limitations on "cash out" in refinancing), the amortization and payment schedule, and the existence of government or private mortgage insurance.[40]

Every loan delivered to Fannie Mae must be accompanied by the note (endorsed in blank), any documents modifying the note, any applicable power of attorney, an original unrecorded assignment of the mortgage to Fannie Mae (unless the original mortgagee was MERS[41]), and a Delivery Transmittal form.[42]

These procedures are also typical of private (non-government-sponsored) entities that purchase mortgages on the secondary markets. Indeed, the latter often demand that the selling mortgagee provide even more elaborate representations and warranties.[43] Secondary markets may also require delivery of additional documents beyond those ordinarily required by Fannie Mae, including the original mortgage that shows the applicable recording data, the original title insurance policy, any guaranties executed in connection with the loan, any applicable private mortgage insurance policy or certificate,[44] and the appraisal made in connection with the loan's origination.[45]

In addition, an investor who buys a "seasoned" loan—one that is not newly-originated—will be intensely interested in its payment history. If there have been defaults in payment, the investor will want to know their

---

39. FANNIE MAE, SINGLE FAMILY 2007 SELLING GUIDE, PART X (2007), *available at* http://efanniemae.com/sf/guides/ssg/#ssg (follow "Access the Selling and Servicing Guides via AllRegs" hyperlink).
40. *Id.* at PART VII.
41. For an explanation of the role of MERS, see *infra* notes 157–59.
42. FANNIE MAE SINGLE FAMILY 2007 SELLING GUIDE, *supra* note 39, at PART IV.
43. *See, e.g.*, Seller's Purchase, Warranties, and Interim Servicing Agreement between DLJ Mortgage Capital, Inc., Purchaser, and Premier Financial Services, Inc., Seller and Servicer, §§ 3.01–.02 (Feb. 1, 2005) [hereinafter *DLJ Agreement*] (on file with author); Loan Purchase Agreement between Countrywide Home Loans, Inc., Purchaser, and E-Loan, Inc., Seller, § 6 (Sept. 25, 1998) [hereinafter *Countrywide Agreement*] (on file with author). The warranties and representations contained in these agreements are far too extensive to set out here, and cover such matters as the absence of any litigation involving the loans being sold, the absence of any necessity of court or governmental approval of the sales, the fact that the sales are not bulk transfers, that the origination and servicing policies followed with respect to each loan are in compliance with applicable laws, regulations, and prudent lending policies, that the seller is solvent and is authorized by Fannie Mae and Freddie Mac to sell mortgages to them, and many other matters.
44. *DLJ Agreement*, *supra* note 43, at Exhibit A–1, Contents of Mortgage File.
45. *Countrywide Agreement*, *supra* note 43, at § 3(b).

duration and severity, and may well decide not to purchase the loan on this basis. This highlights a significant difference between the bills of exchange and bank notes of the eighteenth and nineteenth centuries, when the doctrine of negotiability was established, and modern mortgage notes. The former were virtually always "single-pay" notes, payable either on demand or with a due date or "law day" on which the entire principal was to be paid. So long as the note was purchased before its due date, a preexisting default was impossible and no inquiry concerning default would be relevant. Modern notes nearly always call for installment payments, usually on a monthly basis, and a history of defaults is an important sign of trouble that must be considered by any investor.

The requirements of secondary market investors may be enforced by means of actions for damages when those who sell the mortgages breach the warranties and representations they have made. Requirements can also be enforced through buy-back provisions under which a mortgage that is found to be out of compliance with the investor's standards must be repurchased by the originating mortgagee.[46] Finally, in extreme cases in which the secondary market investor has lost confidence in the originator, the investor may completely terminate the business relationship. In the case of Fannie Mae or Freddie Mac, such a decision can have extremely harsh consequences for the originator,[47] including business failure.

As these procedures demonstrate, the notion that any intelligent secondary market investor would accept a negotiable promissory note in a mortgage transaction as a "courier without luggage" is absurd. Every such investor realizes that the protection provided by the holder in due course doctrine is, by itself, completely inadequate. Indeed, most of the precautions routinely taken by investors in mortgage notes have nothing to do with possible defenses of the note's maker; the precautions relate to the condition of the property and to the borrower. Rather than worrying about defenses the maker of the note might raise, investors are more likely to worry about fraud or deception perpetrated *by* the maker—often with the connivance or cooperation of the originating lender. Negotiability and the holder in due course doctrine are simply irrelevant in this context, and investors must take the other measures outlined above to prevent losses on the loans they buy.

---

46. *DLJ Agreement*, supra note 43, at § 3.03; *Countrywide Agreement*, supra note 43, at § 7. *See also* G-Mac Steps Up Its "Regifting" Of Bad Loans, http://www.banklawyersblog.com/3_bank_lawyers/2009/01/ (Jan. 27, 2009, 21:37 EST) (describing GMAC Residential Funding Company's bringing of roughly twenty lawsuits during 2008 because of failure on the part of mortgage originators to honor their obligations to repurchase nonconforming loans sold to GMAC).

47. *See, e.g.*, Am. Bankers Mortgage Corp. v. Fed. Home Loan Mortgage Corp., 75 F.3d 1401, 1411 (9th Cir. 1996) (Freddie Mac's termination of seller's contract was not unconscionable or a denial of due process); Union Nat'l Bank of Little Rock v. Fed. Nat'l Mortgage Ass'n, 860 F.2d 847, 858 (8th Cir. 1988) (Fannie Mae's termination of seller's contract was not tortious or a RICO violation).

*Modern Negotiability.* Not only are modern mortgage notes vastly different from the bills of exchange and the notes that formed the foundations of negotiability, but the law governing negotiability has also undergone enormous changes. Professor Kurt Eggert has documented the ways in which negotiability was molded and repositioned, first through the Negotiable Instruments Law and then through Article 3 of the U.C.C., to accommodate the wishes of banks as holders, rather than issuers, of negotiable notes.[48] I do not propose to recount that story here, but rather to summarize the law of negotiability as it now stands in the United States.

It is fundamental to understand that Article 3 of the U.C.C. deals exclusively with negotiable instruments;[49] it says nothing at all about notes that are not negotiable, but leaves their treatment to other law. Hence, the holder in due course doctrine, a creature of Article 3,[50] is available only if the note is negotiable,[51] and negotiability can exist only if the requirements of Article 3 are satisfied.

Under Article 3, the definition of an "instrument" is complex and highly technical. An instrument, to be negotiable, must "(a) be signed by the maker or drawer; and (b) contain an unconditional promise ... and no other promise, order, obligation or power given by the maker or drawer ... ; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer."[52]

There are, however, a number of exceptions to the notion that the instrument must not contain any undertaking to do any act other than the payment of money. Thus, under Article 3 it is permissible, without detracting from negotiability, for the instrument to contain:

- an undertaking or power to give, maintain, or protect collateral to secure payment;[53]
- an authorization or power to the holder to confess judgment or realize on or dispose of collateral;[54]

---

48. *See* Eggert, *supra* note 20, at 407–23.
49. This is accomplished by section 3-102's provision that "[t]his article applies to negotiable instruments," and by section 3-104(b)'s statement that "'[i]nstrument' means a negotiable instrument." *See* Nagel v. Cronebaugh, 782 So. 2d 436, 439 (Fla. Dist. Ct. App. 2001) (decision governed by the common law of contracts because the note did not state a principal amount owed, and hence was not negotiable).
50. The concept of the "holder in due course" is defined in U.C.C. section 3-302 (1999).
51. U.C.C. § 3-306 (1999) ("Unless he has the rights of a holder in due course any person takes the instrument subject to (a) all valid claims to it on the part of any person . . . .").
52. *Id.* § 3-104(a)(1)-(2).
53. *Id.* § 3-104(a)(3)(i).
54. *Id.* § 3-104(a)(3)(ii).

- a waiver of the benefit of any law intended for the advantage or protection of an obligor.[55]

In addition, a promise is considered unconditional even if:

- it contains a reference to another record, so long as the promise to pay is not subject to or governed by another record, and rights or obligations with respect to the promise or order are not stated in another record;[56]
- it includes a reference to another record for a statement of rights with respect to collateral, prepayment, or acceleration;[57] or
- payment is limited to resort to a particular fund or source.[58]

Prior to the adoption of the current version of Article 3,[59] a controversy existed as to whether a note carrying an adjustable interest rate could be negotiable in light of the fact that reference to some external source of information, such as a published document reporting the note's index rate, would be necessary to determine the amount owed.[60] This issue was resolved in favor of negotiability in the 1990 revision of Article 3, which provides that interest may be stated as: "[A] fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates. The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument."[61]

As is apparent from these definitions, determining whether a note is or is not negotiable is a complicated and potentially difficult process, which requires a review and analysis of all of the note's terms. The definitions have been broadened and made more complex by successive revisions of Article 3.[62] For example, as noted above, an adjustable rate note would arguably have been nonnegotiable under the prior version of Article 3.[63] So

---

55. *Id.* § 3-104(a)(3)(iii).

56. *Id.* § 3-106(a).

57. *Id.* § 3-106(b).

58. *Id.* The typical illustration is a nonrecourse clause, which limits the holder's right of collection to the collateral, and not the personal assets of the maker.

59. The present version was released by the Uniform Laws Commissioners and the American Law Institute in 1990 and has been adopted by all states except New York and South Carolina. *See* Cornell University Law School, Legal Information Institute, Uniform Commercial Code Locator, http://www.law.cornell.edu/uniform/ucc.html#a3 (last visited Nov. 6, 2009). Additional amendments were released in 2002 but have been adopted by only nine states as of this writing, according to the NCCUSL web site. Uniform Law Commissioners, A Few Facts About the Amendments to Articles 3 and 4 of the U.C.C., http://www.nccusl.org/Update/uniformact_factsheets/uniformacts-fs-ucca3.asp (last visited Nov. 6, 2009).

60. *Compare* Taylor v. Roeder, 360 S.E.2d 191, 195 (Va. 1987) (holding that an adjustable rate note could not be negotiable), *with* Goss v. Trinity Sav. & Loan Ass'n, 813 P.2d 492, 497 (Okla. 1991) (holding that an adjustable rate note could be negotiable).

61. U.C.C. § 3-112(b) (1990).

62. Illustrations of earlier expansions are given in Kurt Eggert's article, *supra* note 20, at 410–23.

63. *See supra* notes 49–58 and accompanying text.

[Vol. 37: 737, 2010]     *Negotiability and the Secondary Mortgage Market*
                                    PEPPERDINE LAW REVIEW

would a note containing a non-recourse clause[64] or a note requiring payment of insurance premiums on the security property.[65] Despite these expansions of negotiability, the concept is not unlimited, and it is obvious that not every note used in a mortgage transaction is negotiable.[66]

Nonetheless, applying the relevant definitions can be a tricky and uncertain process. Two illustrations will demonstrate the difficulty. The first arises from the standard Fannie Mae-Freddie Mac residential mortgage form,[67] which is employed in a very high proportion of all residential loans in the nation. A dozen years ago, Professor Ronald Mann concluded that the note was nonnegotiable on the basis of its statement in the clause permitting prepayment that provided: "When I make a prepayment, I will tell the Note Holder in writing that I am doing so."[68] Mann argued that this sentence was an "undertaking . . . to do a[n] act in addition to the payment of money"[69]—namely, the act of giving the written notice—and that was sufficient to render the note nonnegotiable.[70] It is uncertain whether his conclusion is correct; there is no case authority interpreting this aspect of the clause. Article 3 provides that "A promise or order is 'payable at a definite time' if it is payable . . . at a fixed date or dates . . . subject to rights of (i) prepayment . . . ."[71] This phraseology obviously contemplates that a clause governing the right of prepayment may be inserted without impairing the note's negotiability, and, in opposition to Mann's conclusion, one might argue that the quoted language requiring written notice of a prepayment by the borrower is merely a natural and logical extension of the privilege of providing for prepayment in a negotiable note.

There is simply no way to resolve this question conclusively. Yet, it seems bizarre that the negotiability of the most widely used mortgage note form in the nation, employed in many millions of transactions, is uncertain and that no one has bothered to do anything to clarify it. Professor Mann

---

64. *See* United Nat'l Bank of Miami v. Airport Plaza Ltd. P'ship, 537 So. 2d 608, 610 (Fla. Dist. Ct. App. 1988), *see also* U.C.C. § 3-106(b) (1990) (allowing negotiability even though "payment is limited to resort to a particular fund or source").

65. *See* P & K Marble, Inc. v. La Paglia, 537 N.Y.S.2d 682 (App. Div. 1989), *see also* U.C.C. § 3-104(a)(3)(i) (1990) (stating that a negotiable note may contain "an undertaking or power to give, maintain, or protect collateral to secure payment. . . .").

66. *See supra* note 60 and accompanying text.

67. eFanniemae.com, Single Family, Legal Documents, MULTISTATE FIXED RATE NOTE, FORM 3200, *available at* https://www.efanniemae.com/sf/formsdocs/documents/notes/pdf/3200.pdf.

68. Mann, *supra* note 1, at 971.

69. U.C.C. § 3-104(a)(3) (2005).

70. Mann, *supra* note 1, at 971–73.

71. U.C.C. § 3-108(b) (2005).

argued that the very presence of the notice clause reflected the fact that Fannie Mae and Freddie Mac ultimately do not care about negotiability and, hence, have not troubled themselves to make an effort to remove language that would impair their notes' negotiability.[72] He observed, "Because the home-mortgage note market cannot practicably assure the benefits of negotiability, there is no reason why the parties drafting the notes that the system uses should take any great care to ensure that the notes retain technical negotiability."[73] The benefit that cannot be assured, of course, is the benefit of accepting a note without the necessity of inquiring into a multitude of underlying facts, as we have seen above—a benefit that was the original objective of the negotiability doctrine, but that is wholly unrealistic and unachievable in the context of the modern secondary mortgage market. Professor Mann's example also makes vividly the point that resolving questions of negotiability is not a simple or certain process.

As a second illustration, while teaching my students about negotiability in Winter 2008, I reprinted and distributed to them a promissory note that had been used in a commercial real estate loan made by the Bank of America on a shopping center in a transaction in which I had been involved a few years earlier.[74] Though lengthy, the note was entirely typical of such transactions. I invited the students to read the note carefully and to come to class prepared to discuss whether it was negotiable.

More than two pages of the note were devoted to a "defeasance" clause.[75] Prepayment of the loan was "locked out" and thus was not permitted during the first ten years of the loan's term. However, the defeasance clause permitted the borrower, during this "lockout" period, to release the real estate from the lien of the mortgage by substituting other collateral in the form of U.S. Treasury securities. The complex procedures for doing so were spelled out in detail in the note. Is such a clause an "undertaking . . . to do an[] act in addition to the payment of money,"[76] thus denying the note negotiability? The defeasance clause contained many highly specific steps that the borrower must carry out in order to accomplish a defeasance, but they were applicable only if the borrower first elected to

---

72. *See* Mann, *supra* note 1, at 973.

73. *Id.* at 973.

74. The promissory note was distributed for educational purposes only, and is on file with the author.

75. The defeasance clause was the central issue in our class discussion but not the only possible basis on which the note might have been held nonnegotiable. The note also contained a "late fee" clause, and the cases are divided as to whether such a fee negates negotiability by making the amount due uncertain. *Compare* All Lease Co. v. Bowen, No. 311, 1975 WL 22864 at *1 (Md.Cir. Ct. Nov. 17, 1975) (late fee clause makes note nonnegotiable), *with* In re Apponline.com, Inc., 285 B.R. 805, 821 (Bankr. E.D.N.Y. 2002), *aff'd* 321 B.R. 615 (E.D.N.Y. 2003), *aff'd* 128 Fed. Appx. 171 (2d Cir. 2004) (note may be negotiable notwithstanding late fee clause).

76. U.C.C. § 3-104(a)(3) (2005).