engage in a defeasance.[77] In other words, they were promises to do a variety of acts other than remit payment, but the promises were conditioned on the borrower's voluntary decision to defease the mortgage. I am uncertain whether such a clause would negate the note's negotiability, and can find no case authority answering the question. Once again, it is simply hard to tell.

This illustration has an ironic ending. After discussing the issues in the foregoing paragraph thoroughly in class, I thought we had fought our way to an inconclusive ending. Then a student sent me an e-mail pointing out a different clause—one that the other students and I had overlooked. The introductory paragraph of the note provided: "All of the terms, definitions, conditions and covenants of the Loan Documents are expressly made a part of this Note by reference in the same manner and with the same effect as if set forth herein at length." The term "Loan Documents," as defined in a separate Loan Agreement, included "this Loan Agreement, the Commitment, the Note, the Security Instrument, the Financing Statements, the Assignment of Management Agreement, and all other documents evidencing, securing or relating to the Loan." Needless to say, these documents were chock full of promises "to do . . . act[s] in addition to the payment of money,"[78] and in any event it had become absolutely clear that incorporation of any other document would make a note nonnegotiable![79]

There are two points to be made here. First, determining whether the note would be held nonnegotiable on the basis of its defeasance clause is a venture with an uncertain outcome. Second, because it is absolutely clear that the incorporation of the other loan documents by reference into the note makes it nonnegotiable, one is led to suspect that the drafters of that particular note form simply did not care whether it was negotiable or not. Unless one is willing to assume that Bank of America's lawyers were incompetent or unfamiliar with Article 3, this conclusion seems irresistible.

---

77. Clause 4(b) of the promissory note distributed to my class in Winter 2008 provides that "the borrower may cause the release of the premises . . . upon the satisfaction of the following conditions."

78. U.C.C. § 3-104(a)(3) (2005).

79. Section 3-106(a) provides that a "promise or order is unconditional unless it states . . . that the promise or order is subject to or governed by another record . . . ." Note the subtle distinction: mere reference to the mortgage in the note, or stating that the note is secured by the mortgage, will not render the note nonnegotiable. U.C.C. § 3-106(b) (2005) ("A promise or order is not made conditional (i) by a reference to another record for a statement of rights with respect to collateral, prepayment, or acceleration . . . ."); *see also* In re AppOnline.com, 285 B.R. at 817; DH Cattle Holdings Co. v. Kuntz, 568 N.Y.S.2d 229, 230 (App. Div. 1991). On the other hand, incorporating the mortgage or other external document into the note by reference will destroy negotiability. In re Levine, 24 B.R. 804, 807 (Bankr. S.D.N.Y. 1982), *rev'd on other grounds*, 32 B.R. 742 (S.D.N.Y. 1983).

As we will see below, cases are quite rare in which courts analyze the negotiability of a mortgage note carefully,[80] and even when they do, the quality of the analysis is often unsatisfying. A good (or bad) example is *Bankers Trust (Delaware) v. 236 Beltway Investment*,[81] decided by the Federal District Court for the Eastern District of Virginia in 1994. 236 Beltway, a limited partnership, built a large commercial project with a loan from a bank.[82] The loan was subsequently sold into a securitized pool from which passthrough certificates were sold to investors.[83] The parties had evidently agreed when the loan was made that it would be nonrecourse, but strangely, no one thought to include a nonrecourse clause into the promissory note or other loan documents.[84] When the pool trustee, Banker's Trust, brought an action against the general partners on the note, they raised the defense that the failure to include the non-recourse clause in the note was a result of a mutual mistake, warranting reformation of the note.[85] Banker's Trust claimed holder in due course status.[86] If this claim had been sustained by the court, Banker's Trust would have been immune to the mutual mistake defense, and would have been able to collect from the partners.

The case was complicated by the fact that the original construction loan was made by First National Bank of Maryland with a variable interest rate.[87] When construction was completed, that bank assigned the loan to Meritor Savings Bank, which simultaneously entered into a modification agreement and "allonge" with the borrowers that increased the principal amount of the loan and fixed its interest rate at 10 percent.[88]

The court was faced with deciding whether the note was negotiable, since if it was not, Banker's Trust could not be a holder in due course.[89] Under Virginia law at the time of the loan, a note providing for variable interest could not be negotiable.[90] However, the note was modified by 236 Beltway and Meritor when construction of the project was finished in order to eliminate the variable interest feature.[91] The court refused to consider the modification, despite the fact that it was included in an allonge that was made a permanent part of the note.[92] The court reasoned that the allonge

---

80. See *infra* notes 81–96 and accompanying text.
81. 865 F. Supp. 1186 (E.D. Va. 1994).
82. *Id.* at 1189–90.
83. *Id.* at 1190.
84. *Id.*
85. *Id.*
86. *Id.* at 1191.
87. *Id.* at 1190.
88. *Id.*
89. *Id.* at 1192.
90. The Virginia Supreme Court had so held in *Taylor v. Roeder*, 360 S.E.2d 191 (Va. 1987).
91. 865 F. Supp. at 1190.
92. *Id.* at 1193. An "allonge" is defined as:

[Vol. 37: 737, 2010] *Negotiability and the Secondary Mortgage Market*
PEPPERDINE LAW REVIEW

was a "separate agreement," and hence outside the "four corners" of the note.[93] But this reasoning mistakes the nature of an allonge, which is—and by its nature must be—"permanently affixed" to the note itself, so as to become a part of it.[94] There is no apparent reason that the note, with the attached allonge making the interest rate certain, should not have been considered negotiable on this score.

There was, however, a further issue of negotiability in *Bankers Trust*. The allonge and modification agreement provided that the interest rate was subject to change at the mutual election of 236 Beltway and the holder of the note.[95] The court took the view that this provision made the interest rate

---

A slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsement when the original paper is filled with indorsements. Former UCC § 3-302 required that indorsements be made on the instrument unless there was no space—and only then could an allonge be used. Current § 3-204(a) eliminates that requirement....

BLACK'S LAW DICTIONARY 83 (8th ed. 2004). The development of the allonge concept is quite interesting as it was originally defined as "a piece of paper annexed to a negotiable instrument or promissory note, on which to write endorsements for which there is no room on the instrument itself." SKW Real Estate Ltd. v. Gallicchio, 716 A.2d 903, 906 n.3 (Conn. App. Ct. 1998); *see also* Crossland Sav. Bank FSB v. Constant, 737 S.W.2d 19, 21 (Tex. App. 1987) (allonge could not properly be used if there was space for endorsement on the original note); V. G. Lewter, Annotation, *Indorsement of Negotiable Instrument by Writing Not on Instrument Itself*, 19 A.L.R. 3d 1297 (1968). The current version of Article 3 approves the use of allonges, providing that "[f]or the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument." U.C.C. § 3-204(a) (2005). It also relaxes any requirement that the note itself lack space for the endorsement; Comment one provides, "An indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement." *See* Wells Fargo Bank v. Perry, 875 N.Y.S.2d 853, (Sup. Ct. 2009) (endorsement on allonge is sufficient to transfer ownership of note). This is convenient, because attaching an allonge is mechanically easier than hand-writing or stamping an endorsement on the original note, especially if a large number of notes are to be transferred. However, in recent years, allonges have been increasingly used for purposes other than endorsement. *See, e.g.*, James v. Sec. Nat'l Partners, No. 07-P-1697, 2008 WL 5082899, at *3 (Mass. App. Ct. Dec. 4, 2008) (allonges used to extend maturity date of note and to prohibit negative amortization); Levesque v. Ojala, No. 20034485, 2005 WL 3721859, at *5 (Mass. Dist. Ct. Dec. 8, 2005) (allonge used to modify allocation of payments to principal and interest); EA, LLC v. Tarver, No. CV040184901S, 2005 WL 1971367, at *1 (Conn. Super. Ct. July 22, 2005) (allonge used to extend maturity of line of credit); Prem, Inc. v. Agababian, No. CV040198807S, 2004 WL 2663982, at *1 (Conn. Super. Ct. Oct. 22, 2004) (allonge used to modify terms of note). When used in this way, an allonge is simply a modification agreement that becomes part of the original note. Because the allonge must be attached to the note, there is no evident reason that it should not be considered in assessing the note's negotiability.

93. 865 F. Supp. at 1192.

94. Taylor, 360 S.E.2d at 194. The Virginia cases cited by the court for the proposition that the interest rate must be found within the "four corners" of the note did not involve allonges, but rather situations in which reference to external published sources would need to be consulted to determine the rate. *See id.* (reference to publications of index interest rate); Salomonsky v. Kelly, 349 S.E.2d 358, 359 (Va. 1986) (reference to other agreement between the parties).

95. 865 F. Supp. at 1192.

753

uncertain, because to know whether the 10% interest rate had been changed, one would need to learn whether 236 Beltway had requested a change and the holder of the note had agreed to it.[96] Upon reflection, however, this reasoning seems completely fatuous. The reason is, of course, that the terms of any bilateral contract can *always* be modified if both of the parties agree to the modification. Hence, the provision calling for further changes in the interest rate was essentially meaningless; it merely stated a right that the parties would have had in the absence of the provision, and it changed their legal relationship not a wit. On this point as well, the court seems to have gotten it wrong.

The point of this excursion into the *236 Beltway* opinion is not to belittle the district court judge who wrote it. Indeed, the opinion is generally an exceedingly careful and thoughtful one. Rather, the purpose of the analysis is simply to show that deciding whether a complex promissory note is negotiable is a process fraught with frustration and the possibility of error, and that the predictability of such cases is low. Perhaps that is why so few judges undertake it, as the next section demonstrates.

### III.   Determining Negotiability: A Survey

To obtain a broader picture of the ways in which the negotiability issue is handled by the courts, I attempted to identify every reported case, state and federal, decided in the past twenty years,[97] in which the negotiability of a mortgage note was in issue. Of course, a review of reported cases, most of which are decided by appellate courts, does not necessarily provide an accurate representation of cases that are filed and subsequently settled pre-trial, or are tried but never appealed. Still, these reported cases should give a fair, general sense, if not a statistically accurate picture, of the way negotiability of mortgage notes is being handled by the courts.

Forty-two cases were identified in which a court made a decision on the merits[98] concerning negotiability or an issue, such as the existence of a holder in due course, that depended on negotiability. Remarkably, in only two of the forty-two opinions did the court provide a thorough analysis of the negotiability of the note![99] Three additional opinions discussed only the

---

96. *Id.*

97. A Westlaw search was performed by seeking all cases between the beginning of 1989 and the end of March, 2009 with the terms "mortgage" and "negotiable" or its cognates in the Westlaw syllabus.

98. A decision was considered "on the merits" even if it merely constituted a denial of summary judgment or judgment on the pleadings, provided that opinion included some discussion of negotiability or issues dependent on negotiability.

99. In re AppOnline.com, Inc., 285 B.R. 805 (Bankr. E.D.N.Y.2002), *aff'd* 321 B.R. 615 (Bankr. E.D.N.Y. 2003), *aff'd* 128 Fed. App'x. 171 (2d Cir. 2004); Bankers Trust (Delaware) v. 236 Beltway Inv., 865 F. Supp. 1186 (E.D. Va. 1994).

754


fact that the note might not be negotiable because it provided for an adjustable interest rate,[100] an issue that, as we have seen, was eliminated by revised Article 3. Three other opinions contain a limited analysis, dealing with some of the elements of negotiability but disregarding others.[101]

Hence, in thirty-three of the forty-two cases, the court either expressly assumed without analysis that the note or notes in question were negotiable, or implicitly assumed the same result by moving directly to an issue that depended on negotiability without any mention of negotiability itself![102] It is not easy to explain this widespread disregard for the presence of negotiability. In a few of the cases studied, the court pointed out that the parties themselves had stipulated or conceded that the note or notes were negotiable.[103] It seems probable that in the remaining cases—a large majority of all of the cases studied—the parties either ignored the negotiability issue in their briefs despite its relevance, or their arguments were not intelligible enough for the court to engage in an analysis.

Why should this be so? If one is sufficiently familiar with the elements of negotiability, one can argue that virtually any complex promissory note is nonnegotiable, as the discussion above has illustrated.[104] Evidently the arguments are so complicated that most lawyers steer clear of them. If a set of rules is this off-putting to litigators, perhaps there should be a serious conversation about eliminating it.

This is not to say that the *results* of negotiability are irrelevant or that lawyers fail to argue them. Indeed, thirty-seven of the cases studied involved application of the holder in due course doctrine, which applies, as

---

100. Barnsley v. Empire Mortgage Ltd. P'ship V, 720 A.2d 63 (N.H. 1998); Carnegie Bank v. Shalleck, 606 A.2d 389 (N.J. Super. Ct. App. Div. 1992); Goss v. Trinity Sav. & Loan Ass'n, 813 P.2d 492 (Okla. 1991).

101. Wilson v. Toussie, 260 F. Supp. 2d 530 (E.D.N.Y. 2003) (reciting that the notes "were signed, contain an unconditional promise to pay a sum certain in money, and contain no other promise, order, obligation or power," and focusing on the fact that the notes, while referring to the mortgages, were separate from the mortgages and did not incorporate them by reference); In re Nusor, 123 B.R. 55 (B.A.P. 9th Cir. 1991) (reciting the requirements for negotiability in Article 3 and focusing on the fact that a minor typographical error in the note did not detract from its negotiability).

102. About half of the thirty-four opinions failed to mention negotiability at all, while the other half expressly assumed it.

103. *See, e.g.*, Swindler v. Swindler, 584 S.E.2d 438, 440 (S.C. Ct. App. 2003) (noting that "neither party asserts the instrument fails to satisfy the above criteria"); Thomas v. State Mortgage, Inc., 439 N.W.2d 299, 301 (Mich. Ct. App. 1989) ("Since plaintiffs do not argue that the note is not a negotiable instrument, we shall assume, without deciding, that it meets the requirements for negotiability . . . .").

104. *See supra* notes 59–79 and accompanying text.

noted above, only if the note is negotiable.[105] Other issues raised in the cases that hinge on negotiability included competing claims to the note itself,[106] claims under various federal and state consumer protection statutes,[107] and set-offs or counterclaims against the note-holder.[108] In summary, the majority of the cases can be fairly characterized as reaching results that were dependent on a finding of negotiability, but the courts' determination of that negotiability was poorly executed or not attempted at all.

*The Harshness of Negotiability.* It is impossible to avoid the sense that the negotiability doctrine produces harsh and unfair results to borrowers in many cases. Of the thirty-seven cases I studied that involved application of the holder in due course doctrine, nineteen found that the holder was in due course and fourteen rejected application of the doctrine (four cases remanded or otherwise failed to decide the matter). In at least ten of the cases in which a holder in due course was found, the court used the doctrine to preclude a borrower from raising a defense of fraud in the origination of the loan.

Why should this be so? If a borrower has been defrauded by a mortgage originator, why should the sale of the loan on the secondary market deny the borrower the opportunity to raise and prove the defense? The holder in due course doctrine was invented to ensure the free acceptability of paper issued by banks and other commercial lenders. However, most negotiable notes in today's mortgage market are issued by borrowers, not banks. Borrowers do not supply the forms. They are not usually surrounded by lawyers, accountants, and the other accoutrements of the lending profession designed

---

105. *See supra* notes 49–51 and accompanying text; *see also Barnsley*, 720 A.2d at 65 ("Because the plaintiff's note was not negotiable, the FDIC could not become a holder in due course.").

106. Provident Bank v. Cmty. Home Mortgage Corp., 498 F. Supp. 2d 558, 562 (E.D.N.Y. 2007) (finding that originating lender obtained two executed "originals" of each note and sold them to two different investors); *Toussie*, 260 F. Supp. 2d at 541 (finding that holders in due course were not subject to equitable claims to notes); Midfirst Bank, SSB v. C.W. Haynes & Co., 893 F. Supp. 1304, 1313–14 (D.S.C. 1994) (holding that GNMA, as holder in due course, was not subject to claims to notes it held); Provident Bank v. MorEquity, Inc., 585 S.E.2d 625, 628 (Ga. Ct. App. 2003) (holding that an investor who was not holder in due course took notes subject to security interest of prior warehouse lender).

107. *See, e.g.*, Hays v. Bankers Trust Co. of California, 46 F. Supp. 2d 490, 497 (S.D. W. Va. 1999) (deciding on summary judgment that holder could not be found to be in due course and was therefore subject to all claims of the borrower, including common law claims, state consumer protection act claims, and claims under Truth in Lending and other federal statutes); Ballengee v. New Mexico Fed. Sav. & Loan Ass'n, 786 P.2d 37, 40 (N.M. 1990) (finding that the note holder was not in due course and hence was subject to claim that the note was an improperly unregistered security); Calaska Partners Ltd. v. Corson, 672 A.2d 1099, 1104 (Me. 1996) (holding that because the FDIC was not a holder in due course, it was subject to claims under Equal Credit Opportunity Act).

108. Bisson v. Eck, 720 N.E.2d 784, 785 (Mass. 1999) (finding that the holder was not in due course and was subject to a setoff by maker of note against originating mortgagee).

[Vol. 37: 737, 2010]   *Negotiability and the Secondary Mortgage Market*
PEPPERDINE LAW REVIEW

to guard against their being cheated. Whether consumers or commercial borrowers, participants almost never understand the implications of the holder in due course doctrine, and can hardly be said to have voluntarily elected to make it applicable. Unlike banks, borrowers rarely engage in sufficiently large numbers of transactions in order to give themselves the opportunity to spread the risk of the occasional loss or fraud. To a lender, an infrequent case of fraud merely produces a "bad loan" to be written off against the overall profits of the institution. To a borrower, a single case of fraud can be financially (and often personally) devastating.

No convincing case can be made for the fairness of the quirks of the negotiability doctrine that forces mortgage borrowers to give up their defenses when their loans are sold on the secondary market. Thirty-four years ago, the Federal Trade Commission decreed that the holder in due course concept would no longer apply to most consumer loans.[109] It is now time to complete that process by also exempting mortgage loans from the negotiability doctrine.

## IV. THE PROBLEM OF DELIVERY OF NEGOTIABLE NOTES

Eliminating the negotiability of mortgage notes would also carry with it major advantages to secondary market mortgage investors. This follows from the fact, apparently not well-recognized in the mortgage industry, that the right to enforce a negotiable note can be transferred only by physical delivery of the original note.

To understand why this is so, two sections of U.C.C. Article 3 must be read together. Under section 3-301, a "person entitled to enforce" an instrument means (with certain exceptions not relevant here) either "the holder of the instrument" or "a nonholder in possession of the instrument who has the rights of a holder."[110] Thus, section 3-301 ties the enforcement right to possession of the paper. Section 3-203(a) provides that "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."[111]

The implications of these sections are powerful. Under them, no one can enforce (and hence, no one can foreclose a mortgage secured by) a

---

109. 16 C.F.R. § 433.2 (2009). *See* Tommy L. Holland, *Holder in Undue Course: The FTC Rule Preserving Consumers' Claims and Defenses*, 95 BANKING L.J. 789 (1978). The rule applies to consumer credit sales in which the amount financed is $25,000 or less.
110. U.C.C. § 3-301 (1990).
111. *Id.* § 3-203(a).

negotiable note unless the note has been delivered to that person. While delivery of the note might seem a simple matter of compliance, experience during the past several years has shown that, probably in countless thousands of cases, promissory notes were never delivered to secondary market investors or securitizers, and, in many cases, cannot presently be located at all.[112] The issue is extremely widespread, and, in many cases, appears to have been the result of a conscious policy on the part of mortgage sellers to retain, rather than transfer, the notes representing the loans they were selling. One prominent foreclosure defense attorney, April Charney, estimated that, in about 300 foreclosures she had defended in Florida during 2008, eighty percent of the complaints had lost-note affidavits attached to them, indicating that the foreclosing party did not possess the original note.[113] She commented, "Lost-note affidavits are pattern and practice in the industry. They are not exceptions. They are the rule."[114]

This concept has not been lost on attorneys who defend borrowers in foreclosure actions. Increasingly, attorneys have been appearing in court and demanding that the foreclosing party—ostensibly the holder of the note—actually display it or otherwise prove delivery and possession.[115] In many cases, this proof simply cannot be adduced, and, as a result, the court may well dismiss the foreclosure proceeding.[116]

Technically, this argument against foreclosure is relevant only if the note is negotiable and U.C.C. Article 3 is thereby applicable. The right to

---

112. *See* Gretchen Morgenson, *Fair Game: Guess What Got Lost in the Loan Pool?*, N.Y. TIMES, Mar. 1, 2009, at BU1, *available at* http://www.nytimes.com/2009/03/01/business/01gret.html (pointing out that, while no one knows the number of lost notes, it appears to be substantial); *see also* Bernard Condon, *Paper Chase*, FORBES.COM, June 18, 2007, http://www.forbes.com/forbes/2007/0618/040b.html (reporting on the efforts of attorney April Charney to stop foreclosure proceedings for her clients by persuading courts to refuse to recognize illegally purchased pools of securitized loans); Ed Duggan, *Legal Feud Shows a Foreclosure Can Take Forever*, S. FLA. BUS. J., Jan 4, 2008, *available at* http://sacramento.bizjournals.com/southflorida/stories/2008/01/07/story2.html (describing a homeowner's five-year battle to avoid foreclosure based on the noteholder's inability to produce the note). For an amusing commentary on the case, and on the generally negligent practices of lenders and investors in keeping track of their notes, see a blog entitled Lost Note Affidavits & Skeletons in the Closet, a Posting of Tanta to Calculated Risk, http://www.calculatedriskblog.com/2008/02/lost-note-affidavits-skeletons-in.html (Feb. 26, 2008, 11:54 EST).

113. Bob Ivry, *Banks Lose to Deadbeat Homeowners as Loans Sold in Bonds Vanish*, Feb. 22, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aejJZdqodTCM.

114. *Id.*

115. *See, e.g.*, Norwest Bank v. Walker, 2005-1068 (La. App. 4 Cir. 5/24/06); 933 So. 2d 222. *See also* Mortgage Elec. Registration Sys., Inc. v. Badra, 991 So. 2d 1037 (Fla. Dist. Ct. App. 2008); State St. Bank & Trust Co. v. Lord, 851 So. 2d 790, 791 (Fla. Dist. Ct. App. 2003).

116. *See* Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619 (Mo. Ct. App. 2009). In *Bellistri*, MERS assigned the deed of trust to an assignee, but did not hold or assign the note. *Id.* at 621. The original payee of the note likewise did not assign or transfer the note to the assignee. *Id.* The court held that the assignee did not hold the note, and consequently had no standing to defend against a tax sale purchaser's quiet title action. *Id.* at 623.

[Vol. 37: 737, 2010]   *Negotiability and the Secondary Mortgage Market*
                                              PEPPERDINE LAW REVIEW

enforce a nonnegotiable note *can* be transferred by physical delivery, but it can also be transferred by a separate document of assignment. Indeed, it is arguable that an assignment of the mortgage will automatically assign a nonnegotiable note as well.[117]

The principle that the right of enforcement of a negotiable note can be transferred only by delivery is modified by the "lost note" concept. Under U.C.C. section 3-309:

> A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.[118]

This language seems, on its face, to provide a solution to the problem of the lost note. However, it contains a major weakness. By its literal terms, the person who seeks to enforce the note must have been in possession of it when the loss occurred. Under this view, the "lost note" provisions do nothing to assist a party who claims to own a note but who never had possession of it to begin with, either because it was lost by a predecessor holder or because the predecessor never delivered it to the present claimant. This was the court's understanding of the language in *Dennis Joslin Co. v.*

---

117. *See* RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 5.4(b) (1997) (providing that a transfer of the mortgage will also transfer the obligation unless the parties agree otherwise). *Accord* WM Specialty Mortgage, LLC v. Salomon, 874 So. 2d 680, 682 (Fla. Dist. Ct. App. 2004) ("Any form of assignment of a mortgage, which transfers the real and beneficial interest in the securities unconditionally to the assignee, will entitle him to maintain an action for foreclosure." (quoting Johns v. Gillian, 184 So. 140, (Fla. 1938)); Felin Assoc., Inc. v. Rogers, 326 N.Y.S.2d 413, 415 (App. Div. 1971) ("[T]he mortgage assignment, when accepted and recorded, transfers the interest in the note and mortgage by operation of law . . . where as here there is no doubt that there is an intent to so transfer the interest in the note and mortgage.") (citation omitted). There is, however, considerable dissent from this view. *See* RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 5.4, Reporter's Note, at 389; LaSalle Bank Nat'l Ass'n v. Lamy, 2006 N.Y. slip op. 51534(U) at 2 (N.Y. Sup. Ct. Aug. 7, 2006) (assignment of the mortgage did not transfer the debt); Fleet Nat'l Bank v. Nazareth, 818 A.2d 69, 70 (Conn. App. Ct. 2003) (assignment of mortgage did not transfer the note); South Carolina Nat'l Bank v. Halter, 359 S.E.2d 74, 77 (S.C. Ct. App. 1987) (holding that whether assignment of mortgage transfers note is question of intent).
118. U.C.C. § 3-309(a) (1990).

*Robinson Broadcasting Corp.*[119] Other courts have reached the opposite conclusion. As Professor Tim Zinneker[120] has noted, some courts have extended enforcement rights to assignees of possessors by relying on section 3-203, which states that transfer of an instrument "vests in the transferee any right of the transferor to enforce the instrument . . . ."[121] Other courts have reached the same result by using the general assignment principles incorporated in U.C.C. section 1-103(b),[122] which states: "Unless displaced by the particular provisions of [this Act], the principles of law and equity . . . [shall] supplement its provisions."[123]

The resolution of this issue is uncertain. To correct the problem, in 2002 the Permanent Editorial Board of the Uniform Commercial Code approved an amendment to section 3-309 that authorizes enforcement of a note by a person who "has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred."[124] However, the Amendment has been adopted only in ten states: Arkansas,[125] Florida,[126] Kentucky,[127] Minnesota,[128] Nebraska,[129] Nevada,[130] New Hampshire,[131] Oklahoma,[132] South Carolina,[133] and Texas.[134] In the rest of the nation, the uncertainty remains.

Even in states in which the "lost note" provisions apply to a loss by a predecessor, compliance with them is quite burdensome. For example,

---

119. 977 F. Supp. 491 (D.D.C. 1997). *See also* Cadle Co. of Conn. v. Messick, 45 U.C.C. Rep. Serv. 2d 563 (Conn. Super. Ct. 2001) (reaching the same conclusion); State St. Bank & Trust Co. v. Lord, 851 So. 2d 790 (Fla. Dist. Ct. App. 2003) (subsequently reversed by the Florida adoption of amended § 3–309); *see also* U.C.C. § 3-309(a) (1990).

120. Timothy R. Zinnecker, *Extending Enforcement Rights to Assignees of Lost, Destroyed, or Stolen Negotiable Instruments under U.C.C. Article 3: A Proposal for Reform*, 50 U. KAN. L. REV. 111 (2001). Zinneker's treatment is extremely thorough and thoughtful.

121. U.C.C. § 3-203 (2005); *see also* NAB Asset Venture II, L.P. v. Lenertz, Inc., No. C4-97-2181, 1998 WL 422207, at *5 (Minn. Ct. App. July 28, 1998).; Bobby D. Assocs. v. DiMarcantonio, 751 A.2d 673, 676 (Pa. Super. Ct. 2000).

122. *See, e.g.*, Atlantic Nat'l Trust, LLC v. McNamee, 984 So. 2d 375 (Ala. 2007); Beal Bank, S.S.B. v. Caddo Parish-Villas S., Ltd., 218 B.R. 851 (N.D. Tex. 1998), *aff'd*, 250 F.3d 300 (5th Cir. 2001); YYY Corp. v. Gazda, 761 A.2d 395, 401 (N.H. 2000).

123. U.C.C. § 1-103 (2002).

124. *Id.*

125. ARK. CODE ANN. § 4-3-309 (1987), *amended by* 2005 Ark. Acts, No. 856, § 33.

126. FLA. STAT. § 673.3091 (2009), *amended by* 2004 Fla. Laws ch. 2004-3.

127. KY. REV. STAT. ANN. § 355.3-309 (West 2009), *amended by* 2006 Ky. Acts ch. 242, § 37.

128. MINN. STAT. § 336.3-309 (2009), *amended by* 2003 Minn. Laws ch.81, Art.1, § 6.

129. NEB. UNIFORM COMMERCIAL CODE § 3–309, *amended by* 2003 Neb. Laws, LB 128, § 3.

130. NEV. REV. STAT. § 104.3309 (2009), *amended by* 2005 Nev. Stat. ch. 439, § 6.

131. N.H. REV. STAT. ANN. § 382-A:3-309 (2009), *amended by* 2003 N.H. Laws 121:1.

132. OKLA. STAT. tit. 12A, § 3-309 (2009), *amended by* 2008 Okla. Sess. Laws, ch. 382, § 7.

133. S.C. CODE ANN. § 363-309 (2009), *amended by* 2008 S.C. Acts, Act No. 204.

134. TEX. BUS. & COM. CODE ANN. § 3-309 (Vernon 2009), *amended by* 2005 Tex. Gen. Laws, ch. 95, § 6.

under the 2002 Amendments to section 3-309, the party seeking to enforce the note must still prove that its predecessor has possession of the note and did not transfer it to anyone else.[135] Presumably, this requires obtaining an affidavit from the predecessor, which may not be an easy task, particularly if that party is now bankrupt, dissolved, or has been absorbed into another entity. In addition, the party seeking enforcement must prove that the right to enforce the instrument was transferred to it by the predecessor, and must provide proof that the maker of the note is "adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument."[136] The "adequate protection" is typically provided in the form of a commercial surety bond insuring that the maker will not be subjected to a double claim,[137] and the cost may be quite significant.[138]

Moreover, in many cases the foreclosing party who executes a lost note affidavit is without a doubt committing perjury. The typical affidavit provides: "The note has been lost and after the exercise of due diligence cannot be located."[139] Section 3-309 does not literally require the inclusion of the "due diligence" language; it merely requires proof that the party seeking enforcement cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.[140] The "due diligence" language is probably included in most affidavits simply because the borrower's counsel or the judge would otherwise be likely to ask, "Did you try to locate the note?" But if the note is still in the hands of

---

135. U.C.C. § 3-309(a) (2002).
136. *Id.* § 3-309(b).
137. *See* Huckell v. Matranga, 160 Cal. Rptr. 177, 182 (Ct. App. 1979) (corporate surety bond, and not merely personal indemnity of the note's holder, is required to comply with U.C.C. Article 3 lost note provisions).
138. For example, one surety company estimates that the bond is typically for one-and-a-half to two times the amount of the note, at a premium of two percent. For a debt of $250,000, the premium could be $10,000. *See* Surety1, Lost Trust Deed/Note Surety Bond, *available at* http://www.surety1.com/surety_bond.php?id=37 (last visited Nov. 7, 2009).
139. *See, e.g.*, North Carolina General Statutes § 47-46.3 Affidavit of Lost Note, OneCLE, *available at* http://law.onecle.com/north-carolina/47-probate-and-registration/47-46.3.html; Regal Title Agency (New York), Affidavit of Lost Note, *available at* http://www.regalnyc.com/forms/aff/lost_note_affidavit.pdf. Not all forms contain the "due diligence" language; other forms merely state that "[t]he original note has been lost, misplaced, or destroyed and cannot be produced." *See, e.g.*, Fairfax Commissioner of Accounts, Affidavit of Lost Original Note Pursuant to Virginia Code § 55-59.1(B), *available at* http://www.fairfaxcommissionerofaccounts.org/open/docs/Lost%20Note%20Affidavit.pdf. Even under this language, a court might well insist that the individual executing the affidavit have actual knowledge that the note "cannot be produced."
140. U.C.C. § 3-309(a) (1999).

the originating mortgagee or some intermediate holder, as is often the case, it is extremely unlikely that the party presently foreclosing has contacted that party and inquired as to the note's whereabouts. In this situation, the "due diligence" language is simply a lie. Of course, borrowers are often unrepresented by counsel in foreclosure, so the affidavit will often be accepted without question. To this point, one foreclosure defense attorney commented, "As an officer of the court, I find it troubling that they've been going in and saying we lost the note, and because nobody is challenging it, the foreclosures are pushed through the system."[141]

There is a further problem arising from the fact that the provisions of section 3-309 do not fit well with nonjudicial foreclosure. It is clear that the drafters of section 3-309 had judicial enforcement of the note in mind; they say that "the court may not enter judgment"[142] until adequate protection against double enforcement is provided. But in a nonjudicial foreclosure,[143] no court or judge is involved unless the debtor brings an action to enjoin the foreclosure, which is surely rare.[144] It is unclear to whom the relevant proof or affidavits under section 3-309 will be submitted, or who will evaluate the adequacy of the bond or other protection against double liability of the debtor. If a title insurance company is asked to insure title coming out of the foreclosure proceeding, presumably it will need to be satisfied that the documents and bond are sufficient to stand up to a later judicial attack. Similarly, the trustee under a deed of trust may (or may not) ask or demand to see or take possession of the note, and may (or may not) insist on compliance with section 3-309 if it is not produced.[145]

A final caution: All of the discussion above assumes that the promissory note is negotiable, because U.C.C. Article 3 has no application to

---

141. Ivry, *supra* note 113 (quoting comments of Jane Raskin of Miami, Florida).

142. *Id.*

143. For a thorough description of nonjudicial foreclosure, which is available in about half of the American states, see Grant S. Nelson & Dale A. Whitman, *Reforming Foreclosure: The Uniform Nonjudicial Foreclosure Act*, 53 DUKE L. J. 1399 (2004).

144. In the absence of a proceeding seeking an injunction, the mortgagor may well be held to have waived any defenses to a nonjudicial foreclosure. *See* Plein v. Lackey, 67 P.3d 1061 (Wash. 2003) (en banc).

145. Under California law, for example, the trustee is not required to have possession of the note in order to pursue a nonjudicial foreclosure. *See* Quintos v. Decision One Mortgage Co., No. 08-CV-1757 JM (POR), 2008 WL 5411636 (S.D. Cal. Dec. 29, 2008); Neal v. Juarez, No. 06cv0055 J(JMA), 2007 WL 2140640 (S.D. Cal. July 23, 2007). Both of these recent federal decisions are based on the court's reasoning in *California Trust Co. v. Smead Inv. Co.*, 44 P.2d 624 (Cal. Ct. App.1935). One California attorney observed, "In California, if you were to walk into any one of the major title companies offices to ask their 'trustee' to foreclose on property secured by note they would ask you for two documents. The note and the reconveyance." Posting of Pamela D. Simmons, Soquel, California, to http://dirt.umkc.edu/ (Oct. 20, 2009) (on file with author). She added that, since many trustees are not major title companies, "[n]ow it is clear many trustees are not checking this." *Id.*

nonnegotiable notes.[146] But as we have already seen, determining whether a mortgage note is or is not negotiable is a highly problematic task, and there is no assurance that a court will agree with a determination by the note's holder.[147] If the note is held to be nonnegotiable, state law may or may not provide any procedure, analogous to U.C.C. section 3-309, to deal with the "lost note" issue.[148]

*Producing the Note.* While U.C.C. section 3-203(a) requires delivery of a negotiable note to the person seeking to enforce it,[149] it does not literally require that the note be produced in court and introduced as evidence in the foreclosure or enforcement action. At least conceptually, other proof that the note was in fact delivered might suffice.[150] Nonetheless, it is easy to see why courts would (and often do) regard production of the note as the most obvious and natural way—and usually the only way—of proving that it was delivered.[151] As the Arkansas Supreme Court observed, "Arkansas case law dating as far back as 1842 has required a creditor to prove the debt by admitting the original promissory note into evidence."[152] The court added, "[f]or [the mortgagee] to have prevailed in enforcing the [debtors'] note, it

---

146. YYY Corp. v. Gazda, 761 A.2d 395 (N.H. 2000) (nonnegotiable agreement could be enforced despite the fact that party seeking enforcement did not have possession of note).

147. *See* Ocwen Fed. Bank, FSB v. Russell, 53 P.3d 312, 326 (Haw. Ct. App. 2002) (summary judgment refused because genuine issue of material fact exists as to whether note is negotiable).

148. *See, e.g.*, VA. CODE ANN. § 55-59.1(B) (2009) (requiring the lender in a nonjudicial foreclosure to give the debtor notice that the note is unavailable, and authorizing the debtor to petition the circuit court for a order providing adequate protection against double liability). The statute is not dependent on the note's negotiability. *See also* New England Sav. Bank v. Bedford Realty Corp., 680 A.2d 301, 310 (Conn. 1996) (where note is lost, contents of note can be proved by secondary evidence and note can be enforced); Felin Assoc., Inc. v. Rogers, 326 N.Y.S.2d 413, 415 (App. Div. 1971) (affidavit found acceptable in place of lost nonnegotiable note); Hayes v. Bouligny, 420 S.W.2d 800, 802 (Tex. Civ. App. 1967) (assignee of nonnegotiable note proved its terms by "legally competent evidence" and could enforce it). It is arguable that when the lost note is nonnegotiable, no indemnity in favor of the maker against double enforcement need be required, because if the maker pays the note, she or he will be able to assert the payment as a defense in a second enforcement action. *See* Bainbridge Farm Co. v. Bower, 21 S.E.2d 224, 227 (Ga. 1942).

149. U.C.C. § 3-203(a) (2005).

150. *See, e.g.*, Braut v. Tarabochia, 17 P.3d 1248, 1249 (Wash. Ct. App. 2001) (court willing to accept a photocopy of the note as evidence that the holder possessed it); In re Foreclosure Cases, 521 F. Supp. 2d 650, 654 (S.D. Ohio 2007) (court indicated a willingness to accept a legible photocopy of the promissory note if the assignment of the mortgage was recorded and all other procedural requirements were in order).

151. Ingram v. Earthman, 993 S.W.2d 611, 632 (Tenn. Ct. App. 1998) ("It is the better practice in a suit on a note, negotiable or not, for the plaintiff to produce the original note at trial and introduce it into evidence. Doing so effectively forestalls any issue concerning whether the plaintiff is the holder or owner of the note.").

152. McKay v. Capital Res. Co., 940 S.W.2d 869, 870 (Ark. 1997).

was required either to produce the original or satisfy the requirements for a lost negotiable instrument under [U.C.C. section 3-309]."[153]

Oddly (unless one has read the earlier portion of this article), these sorts of holdings often make no reference to whether the note was negotiable.[154] The notion that the mortgagee must have physical possession of even a nonnegotiable note and display it seems well-embedded in the law, even if one cannot precisely locate that notion's roots.

Of course, failure to produce the note is not the only reason a court might dismiss a foreclosure action. For example, if the action is brought by a servicer, even one with clear written authority to represent the mortgagee, the court might still dismiss the action for lack of standing[155] or failure of the "real party in interest"[156] to appear. Similarly, whether a foreclosure may be

---

153. *Id.* at 871. Note the court's implicit assumption that all notes are negotiable. *See also* Fleet Nat'l Bank v. Nazareth, 818 A.2d 69 (Conn. App. Ct. 2003) (holder of mortgage assignment but not of assignment of note could not maintain foreclosure); State St. Bank & Trust Co. v. Lord, 851 So. 2d 790, 791 (Fla. Dist. Ct. App. 2003) ("To maintain a mortgage foreclosure, the plaintiff must either present the original promissory note or give a satisfactory explanation for its failure to do so."). Presumably such a satisfactory explanation would come in the form of a lost note affidavit. *But see* cases cited *supra* note 75 (contradictory cases of nonnegotiable notes).

154. *See supra* notes 80–96 and accompanying text for an illustration of the widespread failure of the courts to pay attention to negotiability. For another good example, see SMS Fin., LLC v. ABCO Homes, Inc., 167 F.3d 235 (5th Cir. 1999) (quoting U.C.C. Article 3 at length and holding that the holder of a note can enforce it even if delivery to the holder was inadvertent, but providing no discussion of whether the note was negotiable or not).

155. *See, e.g.,* In re Jacobson, 402 B.R. 359 (Bankr. W.D. Wash. 2009) (holding that servicer to which the note had not been assigned had no standing to pursue foreclosure); Bayview Loan Servicing, L.L.C. v. Nelson, 890 N.E.2d 940 (Ill. App. Ct. 2008) (servicer to which note and mortgage had never been assigned had no standing to pursue foreclosure).

156. *See, e.g.,* DLJ Mortgage. Capital, Inc. v. Parsons, No. 07-MA-17, 2008 WL 697400, at *4 (Ohio Ct. App. Mar. 13, 2008) (finding servicer was not real party in interest at the time foreclosure was ordered by trial court, where holder of note and mortgage did not assign them to servicer until after order was entered); First Union Nat'l Bank v. Hufford, 767 N.E.2d 1206, 1207 (Ohio Ct. App. 2001) (holding that where original mortgagee was merged to another institution to form a third institution, which filed foreclosure action, the foreclosing entity was not the real party in interest in the absence of an assignment of the note and mortgage to it; holding also that a letter from Comptroller of the Currency verifying merger was insufficient evidence of foreclosing entity's interest). *Cf.* McCray v. Federal Nat'l Mortgage Ass'n, 663 S.E.2d 736 (Ga. Ct. App. 2008) (both note holder and servicer may be real parties in interest). Furthermore, under Federal Rules of Civil Procedure, "An action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17. The federal courts have struggled with the issue of whether a mortgage servicer is a real party in interest. *See* In re Woodberry, 383 B.R. 373 (Bankr. D.S.C. 2008) (where note was endorsed in blank and in possession of servicer, it was a "real party in interest;" no recorded assignment of the mortgage was necessary); In re Foreclosure Cases, 2007 WL 3232430, at *2 (N.D. Ohio Oct. 31, 2007) (finding no violation of the "real party in interest" rule if the foreclosing servicer had a recorded assignment of the mortgage). *Contra,* In re Kang Jin Hwang, 396 B.R. 757 (Bankr. C.D. Cal. 2008) (when mortgage loan has been securitized, real party in interest is the trustee of the securitized trust, not the servicing agent); In re Jacobson, 402 B.R. 359 (Bankr. W.D. Wash. 2009) (same); In re Sheridan, 2009 WL 631355 (Bankr. D. Idaho 2009) (MERS as nominee for holder of note was not real party in interest and could not maintain foreclosure action). As the court in *Jacobson* commented, "This is the flip side of Woody Allen's observation that 'Eighty per cent of success is showing up'—if you (or your counsel of record if you are a corporate entity) don't, your

764