[Vol. 37: 737, 2010]         *Negotiability and the Secondary Mortgage Market*
                                                        PEPPERDINE LAW REVIEW

pursued in the name of MERS[157] has been controversial.[158] And in a number of states, proof of a recorded chain of assignments of the mortgage to the present holder is essential to a valid foreclosure.[159] But these problems can

---

chance of success approaches zero." *Jacobson*, 402 B.R., at 365.

157. MERS is the Mortgage Electronic Registration System created by the major participants in the secondary mortgage market to maintain an electronic, on-line registry of mortgage assignments (and thus avoid the expense and inconvenience of recording assignments in the public records). The mortgage may be originated in the name of MERS as nominee for the actual mortgagee, or the mortgage may be assigned to MERS after origination. However, MERS does not hold or take possession of the corresponding mortgage notes, and custody of the notes is the responsibility of the originating mortgagee and any secondary market purchasers. *See* Carson Mullen, *MERS: Tracking Loans Electronically*, MORTGAGE BANKING, May 2000, at 64. MERSCORP, Inc. is a privately held Delaware stock corporation currently owned by twenty-eight companies, including Fannie Mae, Freddie Mac, the Mortgage Bankers Association of America, the American Land Title Association, First American Title, Stewart Title, MGIC, PMI, Merrill Lynch, and various mortgage companies. In some jurisdictions, it has been customary for mortgagees to pursue foreclosure in the name of MERS because it is the holder of record of the mortgage. When this occurs, MERS' standard procedures dictate that the promissory note be assigned and its possession transferred to MERS prior to initiation of the foreclosure. *See* MORTGAGE ELEC. REGISTRATION SYS., OHIO FED. COURT OPINIONS AND ORDERS IN MORTGAGE FORECLOSURE ACTIONS (Nov. 28, 2007), *available at* http://www.mersinc.org/MersProducts/publications.aspx?mpid=1. This was done and upheld by the court, for example, in *Mortgage Electronic Registration Systems, Inc. v. Coakley*, 838 N.Y.S.2d 622 (App. Div. 2007). If these procedures are followed, MERS suggests (evidently correctly) that no problem should arise with the "real party in interest" doctrine. *Id.*

158. The argument against MERS' standing stems from the fact that, even if it holds both the note and the mortgage, it is in fact a nominee for the beneficial owner of the note. Most recent state cases have held that this is irrelevant, and that MERS is entitled to pursue the foreclosure on behalf of the beneficial owner. *See In re Huggins*, 357 B.R. 180 (Bankr. D. Mass. 2006); Mortgage Elec. Registration Sys., Inc. v. Ventura, No. CV054003168S, 2006 WL 1230265 (Conn. Super. Ct. Apr. 20, 2006); Mortgage Elec. Registration Sys., Inc. v. Revoredo, 955 So. 2d 33, 34 n.2 (Fla. Dist. Ct. App. 2007) ("We simply don't think that this [the fact that MERS is not the beneficial owner] makes any difference"); Mortgage Elec. Registration Sys., Inc. v. Azize, 965 So. 2d 151 (Fla. Dist. Ct. App. 2007); Green Tree Servicing LLC v. Sanders, No. 2005-CA-000371-MR, 2006 WL 2033668 (Ky. Ct. App. July 21, 2006); In re Sina, No. A06-200, 2006 WL 2729544 (Minn. Ct. App. Sept. 26, 2006); Mortgage Elec. Registration Sys., Inc. v. Coakley, 838 N.Y.S. 2d 622 (App. Div. 2007). *See also* Chase Manhattan Mortgage Corp. v. Smith, No. C-061069, 2007 WL 3225534 (Ohio Ct. App. Nov. 2, 2007) (where both note and mortgage had been assigned to MERS, it was real party in interest and could maintain foreclosure action). *Contra* LaSalle Bank v. Lamy, No. 030049/2005, 2006 WL 2251721 (N.Y. Sup. Ct. 2006) (assignment by MERS to foreclosing servicer was ineffective because MERS was a mere nominee). *See also* Landmark Nat'l Bank v. Kesler, 192 P.3d 177 (Kan. Ct. App. 2008) (as a mere nominee, MERS as holder of second mortgage was not entitled to notice of foreclosure of first mortgage).

159. *See, e.g.*, IDAHO CODE ANN. § 45-1505(1) (Michie 2009); MICH. COMP. LAWS ANN. § 600.3204(c)(1) (West 2009); MINN. STAT. § 580.02(3) (2009); 46 OKLA. STAT. tit. §§ 12, 13 (2009); S.D. CODIFIED LAWS § 21-48-2 (2009). *See also* Family Fin. Servs., Inc. v. Spencer, 677 A.2d 479, 483 (Conn. App. Ct. 1996) (construing the Connecticut recording act to deprive a mortgage assignee of standing to foreclose if the assignment is unrecorded); Steve Brandt, *Lawsuit Seeks to Block Some Foreclosures*, MINNEAPOLIS STAR-TRIBUNE, Jan. 26, 2008, http://www.startribune.com/templates/Print_This_Story?sid=14444016 (describing a suit filed in Hennepin County, Minnesota to block foreclosures in the name of MERS because it did not disclose the actual

be resolved by appropriate assignments of the note and mortgage and recording of the mortgage assignments,[160] while lack of possession of the note may well be incurable and prove fatal to the foreclosure.[161]

## V. THE SOLUTION: ELIMINATING NEGOTIABILITY OF MORTGAGE NOTES

As the foregoing discussion demonstrates, the lender who attempts to foreclose a mortgage without possessing and producing the promissory note is faced with a host of difficulties and ambiguities. Improvements in drafting of the U.C.C. and other legislation undoubtedly could alleviate some of these problems, but a larger point remains: in an era in which millions of mortgage loans are transferred, often multiple times, it is nonsensical to rely on physical possession of the note as the indicium of ownership.

The simplest way to change this absurd and dysfunctional system is to declare mortgage notes nonnegotiable. If this were done, delivery of the original note would no longer be the sole method of transferring the right of enforcement. Delivery would still function to transfer the right of enforcement[162] by virtue of the "symbolic writing" notion that regards a note as a reification of the obligation it contains.[163] But a transfer could also be

---

holder of the assigned mortgage, thus arguably violating the Minnesota statute cited above); Terwin Advisors, LLC v. Balbachan, 15 Misc. 3d 1127(A) (N.Y. Sup. Ct. 2007) (dismissing a foreclosure complaint because the moving party failed to show any assignment of the mortgage to it).

160. Lenders often seem resistant to taking (or even understanding) the necessary steps. See *In re Schwartz*, No. 06-42476-JBR, 2009 WL 530278 at *1 (Bankr. D. Mass. 2009), for an example of where the court castigated the foreclosing lender for presenting a "jumble of documents and conclusory statements, some of which are not supported by the documents and indeed even contradicted by them."

161. Perhaps the most spectacular illustration of the problem was the threatened destruction by bankrupt American Home Mortgage Investment Corp. of 490,000 hard copy home mortgage loan files that it had originated because it did not wish to continue to pay the $45,000 per month rental on the storage space. Boston Globe, American Home under Fire over Loan Files, Jan 3, 2008, http://www.boston.com/business/articles/2008/01/03/american_home_under_fire_over_loan_files. The company subsequently relented, agreeing to provide the originals to the current holders of the notes and mortgages for a fee. See Nikki Swartz, *AMH Planned to Trash Mortgage Files*, ALLBUSINESS.COM, May 1, 2008, http://www.allbusiness.com/banking-finance/banking-lending-credit-services/11483889-1.html.

162. Indeed, U.C.C. Article 9 defines an "instrument" to include both negotiable instruments and "any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." U.C.C. § 9-105(1)(i) (2001). Thus nonnegotiable notes are "instruments" under Article 9. Note that this definition is entirely different than that of U.C.C. Article 3, which limits its coverage to negotiable instruments.

163. It is universally agreed that a nonnegotiable instrument can be transferred by delivery. See, e.g., McFarland v. Brier, 850 A.2d 965, 975 (R.I. 2004) (nonnegotiable certificate of deposit can be transferred by delivery); Nat'l Union Fire Ins. Co. v. Proskauer Rose Goetz & Mendelsohn, 634 N.Y.S.2d 609 (Sup. Ct. 1994) (same).

made by a separate document of assignment, with the seller retaining possession of the note.[164]

This change would provide a huge improvement in convenience to those in the secondary mortgage market. It would no longer be necessary for them to be concerned about the location of the original note. Transfers of mortgage note pools could be accomplished by a single assignment document, simply listing each note to be covered by the assignment.[165] When the holder of a mortgage appeared in court in a judicial foreclosure action, the holder would prove ownership of the note by producing a copy of the assignment document, together with a photocopy of the note and mortgage or, if a photocopy is not available, other evidence to establish their terms.[166]

No perceptible change would occur in mortgage industry practice. Indeed, the effect of the change would be to legitimize what mortgage holders have been rebuffed by the courts for trying to do in a number of recent cases: to foreclose without having possession of the original note.[167] The change would have no impact on MERS, the industry's private record-keeping system for mortgage assignments.[168]

---

164. *See* Sec. Pac. Nat'l Bank v. Chess, 129 Cal. Rptr. 852, 856 (Cal. Ct. App. 1976) (note may be transferred by separate instrument of assignment); Means v. Clardy, 735 S.W.2d 6, 10 (Mo. Ct. App. 1987) (nonnegotiable note may be transferred by pledge or assignment); Vaughn v. DAP Fin. Servs., Inc., 982 S.W.2d 1, 7 (Tex. App. 1997) ("A non-negotiable note remains susceptible of assignment, as in the case of any other chose of action."). *Cf.* Bonhiver v. State Bank of Clearing, 331 N.E.2d 390, 397 (Ill. App. Ct. 1975) (nonnegotiable certificate of deposit may not be transferred by separate instrument).

165. When a mortgage originator enters into such an agreement with a secondary market purchaser, the agreement will often contain, in addition to provisions for the sale of the notes and mortgages, provisions for the originator to continue servicing the mortgages. *See, e.g.,* California Housing Finance Agency, *Mortgage Purchase and Servicing Agreement* (Nov. 2007), www.calhfa.ca.gov/homeownership/newlenders/MPSA.pdf; Prudential Mortgage Capital Funding, LLC, *Mortgage Loan Purchase and Sale Agreement* (Mar. 7, 2003), http://consusgroup.com/previews/150319.

166. As noted above, it is also necessary in some jurisdictions to prove a recorded chain of mortgage assignments to the party seeking foreclosure. *See supra* notes 160–61 and accompanying text.

167. *See supra* notes 162–64 and accompanying text.

168. MERS tracks ownership of mortgages, not notes. Its principal purpose is to avoid the inconvenience and expense of repeated recordation of mortgage assignments in the public records as loans are transferred on the secondary market. *See supra* note 157; MERSCORP, Inc, *Mers Commercial: Legal Primer*, *in* Practicing Law Inst., Commercial Real Estate Financing 2008: What Borrowers & Lenders Need to Know Now (2008) ("MERS does not impact the chain of title to the mortgage promissory note.").

*Proving Ownership of Mortgage Notes.* From the time that assignments of "choses in action" became permissible under the English common law,[169] they have been plagued by the absence of any system of ownership records. Because of the absence of such an information system, it is possible for an assignor to make two or more competing assignments, both to good faith purchasers. Anglo-American law has never satisfactorily resolved the dilemma of determining which purchaser should prevail.[170]

As we have seen, this problem was ostensibly solved for negotiable notes under U.C.C. Article 3 by regarding delivery of the original note as the only method of transferring the right of enforcement.[171] Thus if there were two assignees, the one who could actually produce the original note would prevail.[172] This method worked reasonably well as long as the secondary market for notes was mainly a localized one, but as discussed above, it has turned out to be highly unsatisfactory in a national market because of the extreme inconvenience of moving many millions of notes around the nation.

If, as I advocate here, negotiability of mortgage notes is done away with, it will no longer be necessary to deliver the original note in order to transfer the right of enforcement. Hence, owners of notes will not necessarily be able to prove their ownership by possession. Whether some alternative records system for proving ownership is needed is a question that participants in the mortgage market will have to answer to their own satisfaction. Given the cavalier manner in which many have treated both negotiability and possession of original promissory notes, the answer may well be that they regard the issue as not worth worrying about. After all, there are plenty of nonnegotiable mortgage notes in circulation now,[173] and no one seems worried about proving ownership of them. The issue of ownership arises when a mortgage seller dishonestly engages in the double-selling of a loan. While such instances certainly do occur,[174] they are

---

169. *See* Walter Wheeler Cook, *The Alienability of Choses in Action*, 29 HARV. L. REV. 816 (1916) (tracing the evolution of assignability of choses in action). The development of assignability in England was completed by the English Judicature Act, 1873, 36 & 37 Vict., c. 66, § 25 (6).

170. *See* John Calamari & Joseph Perillo, CONTRACTS § 18.21 (5th ed. 2003) (describing the two principal American strains of authority: the New York rule, under which the first assignee prevails, and the Massachusetts rule, under which the first prevails unless the second qualifies by, *inter alia*, receiving a symbolic writing). It is generally assumed that a maker who pays one assignee of a nonnegotiable note will be able to raise that payment as a defense in an enforcement action by a competing assignee. *See* Felin Assocs., Inc. v. Rogers, 326 N.Y.S.2d 413, 415 (App. Div. 1971); Bainbridge Farm Co. v. Bower, 21 S.E.2d 224, 227 (Ga. 1942).

171. *See supra* notes 110–11 and accompanying text.

172. *See, e.g.*, Midfirst Bank, SSB v. C.W. Haynes & Co., 893 F. Supp. 1304, 319–20 (D.S.C. 1994), *aff'd* 87 F.3d 1308 (4th Cir. 1996), (second assignee was found to be a holder in due course and prevailed); Foster v. Augustanna Coll. & Theological Seminary, 218 P. 335 (Okla. 1923).

173. *See supra* notes 59–79 and accompanying text.

174. *See, e.g.*, Impac Warehouse Lending Group v. Credit Suisse First Boston LLC, 270 F. App'x. 570, 2008 WL 731050 (9th Cir. 2008) (holding that a secondary market investor was

768

comparatively rare, and market participants may well decide (or already have decided) that the risks such actions engender do not warrant the expense of measures to forestall them.

If market participants decide that they need to develop a system of public records to track ownership of mortgage notes, at least two possibilities might be suggested. One course of action would be for the purchaser of mortgage notes to insist that the seller place a written legend on each note (or on an attached allonge)[175] stating that the note had been transferred. This approach would be reasonably effective in preventing double-selling of the notes,[176] but implementing and policing it, at least with large masses of residential loans, would likely be regarded as at least as burdensome and undesirable as the purchaser taking possession of the notes.

A second possibility is for MERS to change its existing role and begin taking custody of notes as well as tracking mortgage assignments. This step would be highly effective in proving ownership; the party for whom MERS held the note on its records would be the beneficial owner and could demand a transfer of the note from MERS at any time. But this step would also imply a vast increase in MERS' responsibilities and potential liability; it was rejected when MERS was created in 1997,[177] and it seems unlikely that MERS' owners would be willing to take it now.

Thus, it seems most probable that no record-keeping system for ownership of nonnegotiable notes will develop just as there is no such system now, despite the fact that a significant number of mortgage notes in use today are nonnegotiable. Perhaps the result of making all mortgage notes nonnegotiable will be an increased level of attention by secondary market investors in the honesty and solvency of those from whom they buy loans.[178]

---

not liable for fraudulent double-selling of loans by originator); Provident Bank v. Cmty. Home Mortgage Corp., 498 F. Supp. 2d 558, 562 (E.D.N.Y. 2007) (mortgage originator obtained duplicate originals of promissory notes from borrowers and double-pledged them to two competing warehouse lenders); Midfirst Bank, 893 F. Supp. at 1310 (secondary market investor placed loans in a GNMA pool without paying originator for them); In re Valentine, 146 B.R. 945 (Bankr. E.D. Va. 1991) (originator sold loan to one investor and a portion of the remaining payments to another investor); Am. Bank of the S. v. Rothenberg, 598 So. 2d 289, 289 (Fla. Dist. Ct. App. 1992) (originator pledged mortgage loan to one party and subsequently sold it to another).

175. *See supra* note 92 for an explanation of the allonge.

176. Unless, of course, the legend was placed on an allonge and a dishonest seller carefully removed it before reselling the note.

177. *See* R.K. Arnold, *Yes, There Is Life on MERS*, 11 PROB. & PROP. 33, 33 (July–Aug. 1997) (describing the negotiations and decisions underlying the creation of MERS). *See also* notes 157–159 and accompanying text.

178. Another change in the market that may have a similar result, if it becomes law, is the

## VI. CONCLUSION

I have sought to demonstrate that the negotiability of mortgage notes is a bad idea, and that the time has come to end this practice. Negotiability is bad for borrowers because it often prevents them from raising defenses based on fraud or other misconduct by the originating lender. Negotiability is bad for mortgage holders because it forces them into the extremely inconvenient process of physically transferring the promissory note for each loan sold on the secondary market, or in the alternative, to endure the uncertainties and expenses of the lost note process. Negotiability is bad for both lenders and mortgage holders when it subjects them to the need to litigate about whether a particular note is negotiable or not.

Because there are advantages to both mortgage holders and borrowers in doing away with the negotiability of mortgage notes, there is reason to think that such a change might be politically acceptable to both sides and thus might actually be accomplished. It would be simple to amend the U.C.C. to implement the change. All that is needed is a statement in Article 3 that an instrument secured by real property is not negotiable.

While this change may seem radical, it is likely that it would have only a minor effect on the way mortgage market participants interact. As we have seen, precious little actual attention seems to have been given to making mortgage notes negotiable or to the delivery of those notes in connection with secondary market sales, despite possession's ostensible importance under current law. Under the change proposed here, no attention would be needed. Otherwise, market practices would not change materially, and both mortgage investors and borrowers would benefit.

---

Mortgage Reform and Anti-Predatory Lending Act, H.R. 1728, 111th Congress (passed by the House at this writing). Section 213 of the bill would require all mortgage originators to retain at least a five percent ownership interest in the loans they sell other than standard thirty-year fixed rate fully documented loans. This "skin in the game" provision would have the effect of substantially increasing the capital requirements for mortgage bankers, and might drive some weaker mortgage bankers out of the market, in the view of the Mortgage Bankers Association. *See The Mortgage Reform and Anti-Predatory Lending Act of 2009: Hearing on H.R. 1728 Before the H. Comm. on Fin. Servs.*, 111th Cong. 4 (2009) (statement of David G. Kittle, Chairman, Mortgage Bankers Association), *available at* http://www.house.gov/apps/list/hearing/financialsvcs_dem/mba_-_kittle.pdf.