# EXHIBIT

# R

# DEPOSITION OF
# ERIKA LANCE

http://www.icplegal.com/files/06-02-10 Deposition_of_Erika_Lance.txt

1.

```
 1              IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
                     IN AND FOR DUVAL COUNTY, FLORIDA
 2                            CIVIL DIVISION
                       CASE NO.: 16-2009-CA-016234-MA
 3

 4      BAYVIEW LOAN SERVICES, LLC,

 5           Plaintiff,

 6      vs.

 7      CYNTHIA LEE COREY
        a/k/a CYNTHIA L. COREY, et al,
 8
             Defendant.
 9      _____/

10

11

12
        DEPOSITION OF:        ERIKA LANCE
13
        TAKEN:                Pursuant to Notice by
14                            Counsel for Defendant

15      DATE:                 June 2, 2010

16      TIME:                 11:28 a.m. to 12:38 p.m.

17      LOCATION:             Nationwide Title Clearing
                              2100 Alt. 19 North
18                            Palm Harbor, Florida 34683

19      REPORTED BY:          Brooke Wharton
                              Notary Public
20                            State of Florida at Large

21

22

23
                         MAXA ENTERPRISES, INC.
24                        1275 Cleveland Street
                         Clearwater, Florida  33755
25              (727) 441-2404    Fax: (727) 448-0028
```

2

11/11/2014 9:29 AM

http://www.icolegal.com/files/05-03-10 Deposition_of_Erika_Lance.txt

```
 1     APPEARANCES:        DANIELLE PARSONS, Esquire
                           Law Offices of David J. Stern, P. A.
 2                         900 Pine Island Road
                           Suite 400
 3                         Plantation, Florida  33324
                           Attorney for the Plaintiff
 4
                           LYNN DRYSDALE, Esquire
 5                         126 West Adams Street
                           Jacksonville, Florida  32202
 6                         Attorney for the Defendant

 7

 8
```

```
 9         INDEX                        PAGE NUMBER

10         Direct Examination by Ms. Drysdale. . . . . . 3
           Cross-Examination by Ms. Parsons. . . . . . .52
11         Redirect Examination by Ms. Drysdale. . . . .54
           Reporter's Certificate. . . . . . . . . . . .57
12
```

```
13
```

```
           EXHIBITS                     PAGE NUMBER
14
           Defendant's Exhibit Number 1. . . . . . . . .13
15         Defendant's Exhibit Number 2. . . . . . . . .14
           Defendant's Exhibit Number 3. . . . . . . . .24
16         Defendant's Exhibit Number 4. . . . . . . . .37
           Defendant's Exhibit Number 5. . . . . . . . .47
17
```

```
18

19

20

21

22

23

24

25
```

3

```
 1     THEREUPON

 2                    ERIKA LANCE,

 3     a witness herein, having been duly sworn was examined
```

```
4        and testified upon her oath as follows:

5                    THE WITNESS:  Yes.

6                          DIRECT EXAMINATION

7     BY MS. DRYSDALE::

8            Q    Ms. Lance, could you please state your full name

9     and your business address for the record?

10           A    Yes.  Erika Lynn Lance, 2100 Alternate 19 North,

11    Palm Harbor, Florida 34683.

12           Q    And what business is located at that address?

13           A    Nationwide Title Clearing, Incorporated.

14           Q    And your title presently?

15           A    The senior vice president for administration.

16           Q    Okay.  We introduced ourselves prior to taking

17    the deposition, but just so you'll be hopefully a little

18    more comfortable, we're -- I'm going to be asking you a

19    series of questions.  If you don't understand a question I

20    ask, please ask me to rephrase it, and I'll be glad to do so

21    because if you answer it, I'll assume that you understood

22    it.

23                You'll need to answer out loud for the court

24    reporter so she -- because she can't take down nods or uh-uh

25    or uh-huh's.  If you need to take a break at any time,
```

                                                                    4

```
1     please let us know, and we'll be glad to do so.

2            A    Okay.

3            Q    Have you ever had your deposition taken before?

4            A    Yes.

5            Q    How many times?

6            A    Three.
```

7          Q        Were those related to your position at Nationwide

8    Title Clearing?

9          A        Yes.

10          Q        When were you last deposed?

11          A        About three years ago.

12          Q        And what was the purpose of that deposition?

13          A        It had to do with human resource cases.

14          Q        All three had to do with human resource cases?

15          A        Yes.

16          Q        And were these -- just generally, I don't want to

17    get into the details, but generally people who were employed

18    by Nationwide Title Clearing who were let go?

19          A        No.  They had to do with workmen's compensation.

20          Q        All three?

21          A        Yeah.

22          Q        Okay.  And how long have you been an employee of

23    Nationwide Title Clearing?

24          A        About six and a half years.

25          Q        Have you always held the title senior vice

                                                                                      5

1    president --

2          A        No.

3          Q        -- of administration?

4          A        No.

5          Q        What -- how long have you held that title?

6          A        About four -- four years, four and half years.

7          Q        Prior to that, what was your title?

8          A        Vice president of establishment.

9          Q        And prior to that?

10          A    No, that was it.

11          Q    Okay.  When did you start working at Nationwide?

12          A    January 22nd, 2004.

13          Q    And when you were hired as vice president of

14     establishment, what -- what were your duties?

15          A    I was over the human resource division that also

16     contains the mailroom.

17          Q    So what would you do on a day-to-day basis?

18          A    Hire, fire, benefits, employee interactions,

19     staffing, investigations, ran the mailroom directly, which

20     had, at that time, 35 staff in it.

21          Q    Is that similar to what some -- is sometimes

22     called human relations?

23          A    It's part of it.  Human resources is one

24     department of what -- that division.

25          Q    It was -- and was the division the establishment

6

1     division?

2          A    Division, yeah.  Our organization is laid out in

3     divisions.  You can't see the -- the organizing board behind

4     me on tape, but it's laid out by division.  So there are

5     departments in each division.  So each division usually has

6     three or four departments in it.

7               That one had the actual, like, department of

8     personnel, which would be what you'd consider standard human

9     resources, the mailroom, and then it also had security and

10     investigations and stuff like that.

11          Q    Did you bring a -- a map similar to the one

12     that's behind us with you today?

13      A     No.

14      Q     Okay.  And you're presently -- so when -- when

15  did you switch from vice president of establishment to

16  senior vice president of administration?

17      A     It was around May 2005.

18      Q     And what -- are your day-to-day duties the same

19  today as they were in May 2005?

20      A     No.  They grow and expand, of course, as an

21  organization grows and expands.

22      Q     Okay.  What -- what did you -- what were you

23  doing in May of 2005 on a day-to-day basis?

24      A     Well, I'm -- I'm over the legal area also.  I --

25  at that time, I was over IT.  I'm no longer over our IT

7

1   area.  It mainly had the division I spoke of earlier

2   underneath it and legal and stuff.  Since then, I've also

3   taken on client relations as a division.

4       Q     When you say you're over the legal department,

5   what -- what sort of operations is the legal department

6   involved in?

7       A     Well, any legal notifications that we get or

8   questions.  We have, of course, attorneys that handle

9   various aspects of things, but I -- most of the legal

10  questions that we get or like title companies having things

11  or attorneys and stuff are things that we can handle

12  in-house.

13      Q     So are you an attorney?

14      A     No, I'm not.

15      Q     What type of educational training did you have

http://www.icglegal.com/files/05-02-10-Deposition_of_Erika_Lance.txt

16      prior to being hired by Nationwide Title Clearing?

17          A    Do you just want, like, whether I went to high

18      school or college, that kind of thing?

19          Q    High school, college.

20          A    I went to high school.  I got a GED actually.

21          Q    And then you started working after that?

22          A    I was actually working previous to that.  I

23      started working at 14.

24          Q    Okay.  What was your previous employer most

25      recent to Nationwide Title Clearing?

8

1           A    Consumer Sales Solutions.

2           Q    What type of business is that?

3           A    Telemarketing.

4           Q    Did that company have anything to do with

5       mortgages, deeds?

6           A    Not at all.  They were gas and energy.  I ran

7       their human resources area.

8           Q    Have you had any particular -- any specific

9       training to -- for your present position as senior vice

10      president?

11          A    Six and a half years of working at this company,

12      yes.

13          Q    Okay.  Have you been required to take any title

14      courses, real estate title courses?

15          A    No.  They're not required for this position.

16          Q    Do any of the other employees of Nationwide Title

17      Clearing, are they required to take any type of title, real

18      estate title courses?

19          A     No, because most real estate title courses don't

20     actually apply to what we do here on our side.

21          Q     Okay.  Why -- why don't you give me a broad

22     description then of what you do at Nationwide?

23          A     We do the paperwork for mortgage companies.  Most

24     especially we do Assignments of Mortgage, Lien Releases, and

25     document retrieval and research.

9

1          Q     So that's Assignments, lien retrieval?

2          A     Lien Releases.

3          Q     Releases.

4          A     And document retrieval and research.

5          Q     Does the research not involve title research?

6          A     It can involve title research, but most title

7     courses have to do with the front end or being a realtor or

8     doing closings.  And everything we do, is after a closing --

9          Q     Okay.

10          A     -- paperwork-wise.

11          Q     So the people that work at Nationwide Title

12     Clearing prepare Assignments; is that correct?

13          A     That is one of the functions that we do here.

14          Q     Okay.  And you -- they also prepare Lien

15     Releases?

16          A     Yes.

17          Q     Document retrieval, I'm not sure I understand

18     that term.

19          A     Banks and mortgage companies can require certain

20     documents be in files usually referred to as a collateral

21     file, which usually has a -- like a certified copy of the

http://www.iceleeal.com/files/06-02-19_Deposition_of_Erika_Lance.txt

22      mortgage or the original mortgage, title policy, note,

23      et cetera.  So sometimes we can do projects where we go and

24      retrieve copies of Assignments or mortgages or title

25      policies so they can fill out their file.

10

1          Q    Is -- is that service requested when a bank or a

2      mortgage company or other institution finds that they have

3      documents that are missing in their collateral file?

4          A    It could be requested for any number of reasons.

5      It's just a request they make of us to go do that.

6          Q    And if the documents are not in the collateral

7      file, where generally are you -- do you find the documents?

8          A    We've used the county websites and title

9      companies depending on the document we're looking for.  If

10      we're looking for a recorded copy of a mortgage or an

11      Assignment modification or something like that, we go

12      directly to the county, usually getting a plain paper copy

13      or certified, depending on what's required.

14          If it's a title policy, we usually use the title

15      agents or the, you know, the various levels of company just

16      depending on what we need to or if we have to get a

17      replacement.

18          Q    What about if it's -- do you -- are you ever

19      asked to retrieve original notes?

20          A    You can't retrieve original notes.  They -- if

21      they're not in the file, there's a separate procedure that

22      a bank has to do in order to resolve that issue.

23          Q    And that's not something that National --

24      Nationwide is involved in?

http://www.icelegal.com/files/06-02-101Deposition_of_Erika_Lance.txt

25          A    No.

11

1           Q    You also indicated that you -- Nationwide

2    performs the research.  What type of research?

3           A    That -- that's the research I'm talking about.

4    We can also do lien position searches and lien status

5    searches and stuff like that.

6           Q    So it -- it sounds like --

7           A    -- searches.

8           Q    It sounds like most of the document retrieval is

9    obtaining documents that are of public record; is that

10   correct?

11          A    Oh, yeah.  Or if -- there's some clients we work

12   for where they have us do the collection of the documents

13   after the closing, like from the title agent.  After they

14   get them recorded, we get the originals back from them and

15   forward them on to their investors, not notes but original

16   mortgages and title policies.

17          Q    Who usually makes those requests?

18          A    That would be our client.  It depends on what

19   service they have us sign up for -- they sign us -- they

20   sign up with us for.  Sorry.

21          Q    So is that generally an originating lender

22   requesting documents for an investor?

23          A    It -- yeah.  It just -- it's usually the bank

24   that wrote the mortgage or purchased the mortgage.

25          Q    Do you have any -- does Nationwide have any of

1    its own computer platforms for purposes of obtaining these

2    types of documents for its document retrieval program?

3         A    I don't quite understand the question.

4         Q    Is it -- are there any computer programs

5    internally involved in doing the document retrieval?

6         A    Yes.

7         Q    What's the name of the system?

8         A    It's an oracle-based system.

9         Q    Does it have a name?

10        A    No.

11        Q    I'm showing you a document asking you if you

12   recognize this.  It's a copy of a complaint filed in Bayview

13   Loan Services, LLC, versus Cynthia Lee Corey.

14             Do you recognize that document?

15        A    No.

16        Q    Is this the first time that you've seen this

17   document?

18        A    Yes.

19        Q    Okay.  If you will look through the document, do

20   you recognize any Nationwide documents attached to the

21   complaint?

22        A    No.

23        Q    Okay.  I'm going to show you another document,

24   second amended notice of taking deposition ducus tecum.

25             Do you recognize that document?

13

1         A    Yes.

2         Q    And when was the first time you -- you saw this

3      document?

4           A    I had it faxed to me a few days ago.  It was -- I

5      received it on May 28th.

6           Q    And did you do anything to prepare for your

7      deposition today?

8           A    Yes.

9           Q    What did you do?

10          A    I retrieved the -- the -- some of the documents

11     that are listed on the back that I was able to obtain.

12          Q    Okay.  Anything else?

13          A    No.

14          Q    All right.  And we'll go through your documents

15     in just a few minutes, but I had some other questions to

16     ask.

17          A    Okay.

18               MS. DRYSDALE:  And we'll mark that as

19          Defendant's 1.

20               (Defendant's Exhibit Number 1 was marked for

21          identification.)

22          Q    (By Ms. Drysdale)  I'm showing you a copy of

23     another document asking you if you recognize this document?

24          A    Yes.

25          Q    It's an Assignment of Mortgage?

                                                                14

1           A    Yes.

2           Q    Is this a document that was prepared by

3      Nationwide?

4           A    Yes.

5                MS. DRYSDALE:  I'd like to mark that as

6        Defendant's 2.

7              (Defendant's Exhibit Number 2 was marked for

8        identification.)

9        Q    (By Ms. Drysdale)  So for purposes of the clarity

10       of record, I'll -- I'm going to refer to this as the Corey

11       Assignment.

12       A    Okay.

13       Q    And just looking at the document, if you look at

14       the very top left hand corner, it says, "When recorded,

15       return to CitiMortgage"; is that correct?

16       A    Yes.

17       Q    But -- and that is C/O NTC.  Is that Nationwide?

18       A    Yes.

19       Q    Why is the document returned to Nationwide?

20       A    One of the service -- the service that we did for

21       CitiMortgage had to do with the recording and the tracking

22       of Assignments.  So we sent it to record at the county, and

23       then we have that so that it gets returned to us so we could

24       mark that it came back recorded image the document.

25       Q    And when you say image it, you place it in -- in

                                                                15

1        a computer program?

2        A    I do.  In this particular case, this is an

3        electronically recorded Assignment which means that it was

4        sent via electronic recording and returned to us that way.

5        Q    Is that inputted -- after it's recorded, is that

6        inputted into the oracle-based system that you referred to

7        earlier?  You said you were imaging the documents?

8        A    Yeah.  I do image the documents.  To answer your

http://www.icelegal.com/files/06-02-10_Deposition_of_Erika_Lance.txt

```
 9    question, we have an image repository where we keep track of
10    the documents being imaged.
11         Q    Uh-huh.
12         A    It's -- I don't understand the question about the
13    input.  Do you mean just do we save a copy of the recorded
14    image?
15         Q    Correct.
16         A    Yes.
17         Q    And is that in the image repository?
18         A    Uh-huh.
19         Q    Is there a name for that system?
20         A    No.
21         Q    You just call it the image repository?
22         A    It's just where we keep our images.  It's image
23    storing.
24         Q    What is -- what type of system is that?
25         A    It's a SAN.
```

                                                                    16

```
 1         Q    Is that S-A?
 2         A    -N.
 3         Q    -N.
 4         A    And that is the extent of what I know about it.
 5    It is called a SAN.  It's a type of machine that keeps large
 6    quantities of images so. . .
 7         Q    Do you know what S-A-N stands for?
 8         A    No idea.
 9         Q    Okay.  So in this particular instance,
10    CitiMortgage was NTC's client?
11         A    Uh-huh.
```

```
12              Q    And they contacted you to prepare an Assignment
13       of Mortgage; is that correct?
14              A    They contacted us to prepare a group of
15       Assignments.  It wasn't just one.
16              Q    How many is -- let me start all over with that
17       one.
18                   In this instance, how many did they ask you -- or
19       did they send over at one time?
20              A    I don't have that number.
21              Q    Would it be -- and I'm not asking you to guess,
22       but if you do have a ballpark, would it have been dozens or
23       hundreds?
24              A    Hundreds to thousands but I don't know in this
25       particular case how many.
```

17

```
1               Q    So -- I'm sorry.
2               A    I was going to say we've done over a hundred
3        thousand Assignments so. . .
4               Q    So anywhere from a hundred -- from hundreds to a
5        hundred thousand, they would send a request?
6               A    They send them in groupings.
7               Q    And when you say "they send them in groupings,"
8        that's requests for Assignments of Mortgages --
9               A    Yes.
10              Q    -- in groupings?  Okay.
11                   Right underneath the portion we just read,
12       there's a -- a CMI L number.
13              A    Uh-huh.
14              Q    Do you -- can you explain that number?
```

http://www.icalegal.com/files/06-03-10_Deposition_of_Erika_Lance.txt

15          A    That's a CitiMortgage loan number, and the one

16   underneath is the assignee loan number.

17          Q    And in this instance, do you know who the

18   assignee is?

19          A    Bayview.

20          Q    Just under that, on the Corey Assignment that

21   we've marked as Exhibit 2 --

22          A    Uh-huh.

23          Q    -- there's an effective date.  How -- how is the

24   effective date selected?

25          A    It's given to us by the client.


                                                            18

1          Q    So it's given to you by CitiMortgage?

2          A    Uh-huh.

3          Q    Is it given to you -- is -- is every Assignment

4   in that batch given the same effective date?

5          A    Usually.  It's usually because it's a transfer of

6   a grouping of loans from one entity to another.

7          Q    So that is -- is that also the date that the

8   batch is transferred to Nationwide?

9          A    No.  We could prepare Assignments in advance of a

10   transfer date so that they're ready to be sent to record on

11   the transfer date is usually how it's done.

12          Q    In anticipation of a transfer?

13          A    No.  Usually banks know that they're buying and

14   selling groups of loans to each other --

15          Q    Uh-huh.

16          A    -- and so based on whatever agreement they have

17   and what actions have to transpire previous to that, they

18  could tell us that, say, "x" loans, these 100 loans are

19  going to change hands on this date.  They'll give us the

20  information so they can be ready and prepared to go out the

21  door on that date to go to recording.

22      Q    And just below that, we have the title,

23  "Assignment of Mortgage:  For good and valuable

24  consideration."

25           Are you -- do you have the information as to the

19

1  consideration paid for this particular mortgage?

2      A    Nope.

3      Q    Do you know who does have that information?

4      A    I would assume CitiMortgage and Bayview.

5      Q    But you're not certain?

6      A    No.

7      Q    And then we have "CitiMortgage as successor in

8  interest by merger to CitiFinancial Mortgage Company, Inc.,"

9  whose address is 1000 Technology Drive in O'Fallon,

10  Missouri --

11      A    Uh-huh.

12      Q    -- assigning a mortgage together with a note to

13  Bayview Loan Services; is that correct?

14      A    Yes.

15      Q    Is this typically how Assignments of -- or

16  transfer of notes occur through Assignment of Mortgage?

17           MS. PARSONS:  Objection.  You still have to

18      answer.

19           THE WITNESS:  I still have to answer?

20           MS. PARSONS:  If you know the answer.

21          THE WITNESS:  Yeah.  I'm sorry.  Sorry.

22          MS. PARSONS:  I just do it for the record, just

23      so you know.

24          THE WITNESS:  Okay.  Got it.

25      A     To answer your question, on this particular case,

20

1   I don't know what occurred on it because I was not part of

2   the -- the sale or of the agreement between Bayview and

3   Citi.  We were hired specifically to do Assignments.

4          Normally, this is an action recording at the

5   county to indicate a sale has taken place or a transfer of

6   loans has taken place from one entity to another.

7      Q     (By Ms. Drysdale)  So I'm not sure that -- that

8   answered the question that I was asking.

9          This document is apparently assigning a note?

10     A     Yes.

11     Q     Is that correct?

12     A     Yes.

13     Q     And is it your understanding that that's

14  generally how notes are transferred through Assignments?

15     A     I'm trying to figure out how to answer this

16  question.  It is my understanding that notes are transferred

17  through a sale agreement between mortgage entities.  They

18  record Assignments to put on the record who the current

19  beneficiary is for that note and loan, that mortgage.

20  The -- the Assignment itself is not the, to my

21  understanding, the actual sale of the loan.  Does that make

22  sense?

23     Q     Yes, ma'am.

24          A    Okay.  So that's why I'm saying this is to

25     indicate that that event occurred and to record it at the

                                                              21

1      county recorder's office as having occurred.

2          Q    And you said that you were not part of these or

3      privy to the details of the sale from CitiMortgage to

4      Bayview; is that correct?

5          A    Correct.

6          Q    That you were just asked to prepare a document?

7          A    Prepare Assignments, yes.

8          Q    Okay.  Further down, still on the left hand side,

9      we see the signature of Bryan Bly as vice president?

10         A    Yes.

11         Q    And is Bryan Bly someone who you supervise?

12         A    Directly, no.

13         Q    But he is an employee of Nationwide Title

14     Clearing?

15         A    Correct.

16         Q    Who is his supervisor?

17         A    Elsa McKinnon.

18         Q    Could you spell that, please?

19         A    E-L-S-A M-C-K-I-N-N-O-N.

20         Q    When you and I spoke earlier, you indicated

21     that -- that you might be a better person to provide

22     information about this Assignment than Mr. Bly; do you

23     recall that?

24         A    Yes.

25         Q    And -- and why did you think that you rather than

22

```
 1    his supervisor could be explain what --

 2         A    Because the questions that you were asking in

 3    your affidavit did not just have to do with him signing the

 4    direct document.  You -- the questions pertained also to our

 5    overall procedure and our connection with CitiMortgage,

 6    which are questions that he can't answer.

 7         Q    So then let's talk a little about what Mr. Bly --

 8    what he actually does in executing an Assignment of

 9    Mortgage.  Can you go through that process with me?

10         A    Yeah.  He is what we refer to as a signer.  He is

11    somebody at Nationwide who is designated to execute

12    documents.

13         Q    So just can you give me a general idea of what

14    his -- his day-to-day activities would be?

15         A    He signs and notarizes documents.

16         Q    So when he comes in in the morning, he sat -- he

17    sits at his desk, and that's pretty much all he does all

18    day?

19         A    Yes.

20         Q    Is sign and notarize documents?

21         A    Yes.

22         Q    Assignments of Mortgage?

23         A    Assignments of Mortgage, Lien Releases.

24         Q    Does he actually research any of the information

25    contained in the Assignment of Mortgage?
```

23

```
 1         A    No.

 2         Q    No?
```

3      A    No.

4      Q    About how many documents, including Assignments

5  of Mortgage, would he sign in the average day?

6      A    A couple thousand.

7      Q    And -- and this -- is he permanently employed?

8  Well, let me ask that question in a different way.

9           Is his -- his employer -- his present employer

10 and business address is Nationwide Title at 2100 Alt. 19

11 North; is that correct?

12     A    Yeah.  He's presently a full-time employee with

13 Nationwide Title Clearing.

14     Q    Okay.  In the assign -- the Corey Assignment of

15 Mortgage, he lists his address as 10000 [sic] Technology

16 Drive, O'Fallon, Missouri.

17          Why is that particular address used?

18     A    That has to do with the question on how Bryan Bly

19 can sign as a vice president as well.

20     Q    Okay.

21     A    So the answer to that question has to do with a

22 corporate resolution.

23     Q    Do you have that document with you?

24     A    Yes.

25     Q    May I take a look at that?


                                                            24

1      A    Uh-huh.  I only brought one copy of this, so if

2  we need more, you'll have to let me know.

3          THE WITNESS:  Do we need to get another copy for

4      you before we do this?

5          MS. PARSONS:  Probably.

http://www.icalcpal.com/files/06-02-19_Deposition_of_Erika_Lance.txt

6        THE WITNESS:  Can we pause for one second?

7        (A brief recess was taken at 11:54 a.m.)

8        THE WITNESS:  This is a copy of the Corporate

9     Resolution signed by the board of directors of

10    CitiMortgage, and it appoints Nationwide Title

11    Clearing, "are appointed as assistant secretaries and

12    vice presidents of the corporation."

13        MS. DRYSDALE:  Okay.  So we will mark this as --

14    this Joint Consent of the Executive Committee as

15    Defendant's 3.

16        (Defendant's Exhibit Number 3 was marked for

17    identification.)

18        Q    (By Ms. Drysdale)  Do you still have a copy in

19    front of you?

20        A    I do, yes.

21        Q    Okay.  Do we have or is there located at

22    Nationwide Title Clearing the minutes of the meeting of the

23    executive committee of the board of directors when this

24    consent was created?

25        A    No, it's not required.


                                                              25

1        Q    It's not required?

2        A    No.

3        Q    And is that -- that's what your -- your legal

4     department --

5        A    Correct.

6        Q    Okay.  Do you know how they decided to name these

7     employees listed on the consent as assistant secretaries and

8     vice presidents of the corporation?

9       A    Generally, we -- we provide them a list of the

10   employees that we'd like them to list.

11       Q    Do you know how the -- they're -- because they're

12   basically being designated as officers of the corporation.

13   Do you know why that particular designation was chosen?

14       A    You -- you have to name them as officers in order

15   to sign documents in certain counties.  They're only

16   designated as officers in regards to the actual signing of

17   the documents.  That's -- that's their limitation.  If you

18   read the entire document, that's what it limits them to.

19       Q    So they are -- they are nominated in these

20   positions for the -- I guess, for the sole purpose of

21   processing releases and Assignments; is that correct?

22       A    Correct.

23       Q    Do you know if this -- I guess it's the "Further

24   Resolved" paragraph, relates to the public trustee of the

25   city and county of Denver, Colorado?  Do you know what

26

1   that --

2       A    Yeah.  For a period of time, Colorado required

3   that for people signing documents.  They no longer require

4   it.  It's actually been removed from current corporate

5   resolutions, which is something that particular county

6   required be included on our corporate resolution for a time

7   period.

8       Q    Do you have a copy of the indemnity agreement?

9       A    No.  I did not bring that with me.

10       Q    But that's something that is in possession of

11   Nationwide?

12          A     Yes.

13          Q     And so when Mr. Bly is executing the couple

14    thousand of Assignments a day, that is the extent of his --

15    that's the extent of his duties as vice president?

16          A     Uh-huh -- yes, sorry, or assistant secretary.  It

17    just depends on what's required at the county.  He could be

18    listed as either or.

19          Q     So does Nationwide have a chart of all the

20    counties in Florida to know whether or not Mr. Bly is

21    supposed to be a vice president or assistant secretary?

22          A     We have a list of all the counties in the entire

23    United States that tells us that.

24          Q     So Mr. Bly executes Assignments of Mortgage to be

25    recorded all over the United States?


                                                              27

1          A     And Lien Releases.

2          Q     And Lien Releases.

3                Does he hold that position as vice president for

4    any other companies other than CitiMortgage?

5          A     Yes.

6          Q     What other companies?

7          A     There are many, and I don't know if I can just

8    release all of the names of them.

9          Q     Okay.

10          A     But for all of our clients where we sign, he is

11    listed as one of the signers.

12          Q     Previously you said that the consent of the

13    executive committee was the reason for the -- the address

14    being listed as a 1000 Technology Drive.

Case 3:14-cv-05798-BHS   Document 25   Filed 01/08/15   Page 26 of 28

15          Could you expound upon that?

16     A    Yeah.  He's acting as the capacity as the vice

17 president for that company, and that is the address of that

18 company.

19     Q    So he's not physically located in Missouri?  He

20 just --

21     A    No.  He's physically located in Florida.

22     Q    He just lists that as his address for purposes of

23 this Assignment of Mortgage?

24     A    Correct.

25     Q    And who is Christopher Jones?


                                                            28

1      A    Christopher Jones is an employee of Nationwide

2 Title Clearing.

3      Q    And what are his day-to-day duties?

4      A    He also works in the processing area.  One of the

5 duties he has is he is one of our signers and one of our

6 notaries.

7      Q    Does Mr. Bly also work in the processing

8 department?

9      A    That's the department, yeah.

10     Q    Is Mr. Bly also a notary?

11     A    Yes.

12     Q    Down at the bottom of the Corey Assignment it

13 says that the document was prepared by Jessica Fretwell?

14     A    Yes.

15     Q    Do you know Ms. Fretwell?

16     A    Yes.

17     Q    And is she also an employee of Nationwide?

```
18          A    Yes, she is.

19          Q    And what is her job description?

20          A    She works in our quality control division.

21          Q    What are her day-to-day responsibilities?

22          A    How to do with the establishment of the forms and

23     the county requirements.

24          Q    When you say "the establishment of the forms,"

25     what do you mean by that?
```

29

```
1           A    This form is -- each form that we have is set up

2      for the county.  They have margin requirements, what has to

3      be on it, like how many witnesses, who has to sign it, that

4      sort of thing.  So she established the actual form that the

5      information that our enterers key in, gets fed into.

6           Q    Did she prepare this document?  And I'm referring

7      to the Corey Assignment.

8           A    She prepared the form, and it printed out with

9      the information with -- from our data enterers.

10          Q    So who generated the Corey Assignment, the actual

11     physical piece of paper?

12          A    It came out of our printing area.

13          Q    Did -- was a person responsible for that, or is

14     that something that's automated?

15          A    It's automated.

16          Q    And what is the name of the automated system that

17     creates the actual Assignments?

18          A    Planat Press.

19          Q    Can you spell that for me?

20          A    P-L-A-N-A-T  P-R-E-S-S.
```

http://www.icelegal.com/files/06-02-10-Deposition_of_Erika_Lance.txt

21        Q    And where does Planat Press get the information

22    needed to create the documents?

23        A    The form is created in Planat Press as I

24    described by Jessica Fretwell in the quality control area.

25    They create the form that the document -- the information is

30

1    fed in to, and our data enterers will enter the information.

2    It gets quality control checked, and once it's verified, it

3    then gets printed.

4        Q    So a human enters the specifics, the dates and

5    the names of the entities?

6        A    Yeah.

7        Q    And the name of the signer?

8        A    Yeah.  And in this particular case, that document

9    did not get printed off as I explained earlier.  That's an

10    electronic recording.

11        Q    So this -- the document, the Corey Assignment,

12    was never a physical piece of paper that was manually

13    signed; is that correct?

14        A    That is correct.

15        Q    Okay.  So Mr. Bly didn't actually sign the Corey

16    Assignment; is that correct?

17        A    Well, he didn't physically sign it, but he --

18    that meets with the standards for electronic document

19    recording.

20        Q    Okay.  Are you referring to a specific state or

21    federal law?

22        A    This -- no.  Specific counties across the nation

23    have started setting it up, so part of like going more green